IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

- - - - - - - - - - - - - - - - - x
UNITED STATES OF AMERICA      CR Nos. 1:21-cr-00106-TJK-1
                                     1:21-cr-00106-TJK-2
v.
                               Washington, D.C.
JOSHUA CALVIN HUGHES       Wednesday, April 7, 2021
JEROD WADE HUGHES,          11:45 a.m.
                Defendants.
- - - - - - - - - - - - - - - - - x
_____

TRANSCRIPT OF ARRAIGNMENT, BOND HEARING & ORAL RULING
HELD BEFORE THE HONORABLE TIMOTHY J. KELLY
UNITED STATES DISTRICT JUDGE
_____

APPEARANCES VIA VIDEOCONFERENCE:

For the United States:    James B. Nelson, Esq.
                        U.S. ATTORNEY'S OFFICE FOR
                        DISTRICT OF COLUMBIA
                        555 4th Street, NW
                        Room 4112
                        Washington, DC 20001
                        (202) 252-6986

For the Defendants:     Palmer Hoovestal, Esq.
                        HOOVESTAL LAW FIRM, PLLC
                        P.O. Box 747
                        Helena, MT 59624
                        (406) 457-0970

                        Jonathan S. Zucker, Esq.
                        LAW OFFICES OF JONATHAN ZUCKER
                        37 Florida Avenue, NE
                        Suite 200
                        Washington, DC 20002
                        (202) 624-0784

Court Reporter:         Timothy R. Miller, RPR, CRR, NJ-CCR
                        Official Court Reporter
                        U.S. Courthouse, Room 6722
                        333 Constitution Avenue, NW
                        Washington, DC 20001
                        (202) 354-3111

Proceedings recorded by machine shorthand; transcript
produced by computer-aided transcription.

1                          **P R O C E E D I N G S**

2                  THE DEPUTY CLERK:  We are on the record in

3       criminal matter 21-106, United States of America v.

4       Defendant 1, Joshua Calvin Hughes; and Defendant 2, Jerod

5       Wade Hughes.

6                  Present for the Government is James Nelson;

7       present for Defendant 1 are Shelli Peterson and Palmer

8       Hoovestal; present for Defendant 2 are Jonathan Zucker and

9       Peter Wright; present from Pretrial Services is Andre

10      Sidbury; also present are Defendant 1, Mr. Joshua Hughes;

11      and Defendant 2, Mr. Jerod Hughes.

12                 THE COURT:  All right.  Well, good -- now it's --

13      afternoon, everyone.  And thank you for your patience.

14                 We are here for Defendant Joshua Hughes's

15      arraignment and motion for pretrial release, and then for my

16      ruling on Defendant Jerod Hughes's motion to modify his

17      bond, Defendant Hughes -- Joshua Hughes's motion being ECF

18      No. 13 and Jerod Hughes's motion being ECF No. 8 on the

19      docket.

20                 I thought it would make sense to deal -- I've seen

21      the parties' submissions with regard to Mr. Joshua Hughes.

22      And since we're here for his arraignment, I thought we would

23      just take care of him first and then move on to Jerod

24      Hughes's bond motion.

25                 So first, let me just get -- I think this is the

1    first time I have Joshua Hughes in front of me.  So let me

2    go ahead and read the due process protection language.

3         Pursuant to the Due Process Protections Act, the

4    Court hereby orders Government counsel -- that all

5    Government counsel shall review their disclosure obligations

6    under Brady v. Maryland -- 373 United States 83, a Supreme

7    Court case from 1963 -- and its progeny, as set forth in the

8    Local Rule -- Criminal -- Local Criminal Rule 5.1 and comply

9    with those provisions.  The failure to comply could result

10   in dismissal of the indictment or information, dismissal of

11   individual charges, exclusion of Government evidence or

12   witnesses, continuances, bar discipline, or any other remedy

13   that is just under the circumstances.

14        Mr. Nelson, I trust you understand your

15   obligations under the Due Process Protections Act.

16        MR. NELSON:  Yes, Your Honor.

17        THE COURT:  All right.  Very well, then.

18        Let's go ahead and get Joshua Hughes's arraignment

19   accomplished.

20        Ms. Peterson, can you tell me whether Joshua

21   Hughes has consented to proceeding via video here today.

22        MS. PETERSON:  Your Honor, if I could move to

23   admit Mr. Hoovestal pro hac vice pending the approval of his

24   admission into the bar and then let him handle this

25   proceeding today, since he's the one who's had communication

1    with the client.

2              THE COURT:  Why don't I just do this.  I know we

3    went through this yesterday and I admitted someone without

4    even looking at their status -- application.  I think I can,

5    under the rules -- Mr. Hoovestal, you can address me with my

6    permission regardless of whether you're admitted.  And I'm

7    sure we'll get your admission taken care of in time.  But,

8    Mr. Hoovestal, so I'm happy to hear from you on this

9    question of whether your client has consented to be

10   arraigned here today via video.

11             MR. HOOVESTAL:  Yes, Your Honor.  We've discussed

12   this by telephone yesterday, and Mr. Hughes does consent to

13   proceeding to his arraignment by video.

14             THE COURT:  All right.  Very well.

15             Let me ask Ms. Harris, then, to arraign Mr. Joshua

16   Hughes.

17             THE DEPUTY CLERK:  Joshua Calvin Hughes, in

18   criminal matter No. 21-cr-106, you are charged with 18

19   United States Code Section 231(a)(3) --

20             (Brief pause.)

21             Okay.

22             (Brief pause.)

23             One second.  All right.  Sorry about that.

24             -- 18 United States Code Section 231(a)(3), civil

25   disorder; 18 United States Code Section 1512(c)(2), 2,

1    obstruction of an official proceeding; 18 United States Code

2    Section 1361 and 2, destruction of government property; 18

3    United States Code Section 1752(a)(1), entering and

4    remaining in a restricted building or grounds; 18 United

5    States Code Section 1752(a)(2), disorderly and disruptive

6    conduct in a restricted building or grounds; 40 United

7    States Code Section 5104(e)(2)(A), entering and remaining on

8    the floor of Congress; 40 United States Code Section

9    5104(e)(2)(C), entering and remaining in certain rooms in

10   the Capitol building; 14 [sic] United States Code Section

11   5104(e)(2)(D), disorderly conduct in a Capitol building; 40

12   United States Code Section 5104(e)(2)(G), parading,

13   demonstrating, or picketing in a Capitol building.

14         Do you waive the formal reading of the indictment?

15   And for the purposes of this arraignment, how do you wish to

16   plea?

17         MR. HOOVESTAL:  He would like to enter not guilty

18   pleas, Your Honor.

19         THE DEPUTY CLERK:  A plea of not guilty is

20   entered, Your Honor.

21         THE COURT:  All right.  Very well.

22         Let's, then, turn to Joshua Hughes's motion for

23   bond.  I see that the Government has consented to the motion

24   with certain conditions.  So why don't I first just give --

25   normally, I'd want to hear from the defendant first, but in

1      this case, given that the Government -- the parties appear

2      to have worked this out, let me just -- or at least

3      conceptually -- let me just, maybe, give -- Mr. Nelson, give

4      you an opportunity to --

5              Okay.  I'm getting a little bit of feedback.  So

6      can everyone but, let's say, Mr. Nelson for the moment mute

7      your microphone.  Okay.  Great.

8              Mr. Nelson, why don't I give you just an

9      opportunity to put on the record why you find it acceptable

10     to release Mr. Joshua Hughes with the conditions that you've

11     suggested.

12             MR. NELSON:  Yes, Your Honor.

13             And I think I would preface this by noting what I

14     know the Court already knows, you know?  The goalposts have

15     been moving a little bit on this with the recent decision

16     with Munchel and with some of the other factors that we had

17     not perhaps taken into consideration when this case was

18     first charged.  But I really, you know -- this largely arose

19     following up on your Your Honor's pointed question with

20     regard to rebutting the presumption with regard to Jerod

21     Hughes.  And, you know, I think that based on what I have in

22     front of me, Joshua Hughes is able to rebut the presumption

23     in two ways.  One is his conduct at the Capitol itself was

24     as a follower.  Having gone back and re-reviewed the

25     surveillance footage, I did not see him in a single instance

1    touch anyone or anything.  He was present, he is culpable,

2    but it is -- that is a differentiating circumstance.  Also,

3    unlike Jerod Hughes, he has no criminal history.  I see one

4    other pending charge with no convictions.  And so I think

5    that rebuts the presumption, as well.

6         And then factoring the facts which rebut the

7    presumption into the factors, I, you know -- in viewing them

8    -- and I laid all this out for the Court just so the Court

9    would have some sense of my thought process -- I think that

10   it tips the scales in favor of release particularly in light

11   of Munchel in that, you know, while there may be some

12   concern with regard to the pending charge and its impact on

13   following the Court's orders, I don't think that that rises

14   to the level of dangerousness in the same way as with the

15   other defendants such that this defendant should be held,

16   given the guidance we now have from the D.C. Circuit.

17        THE COURT:  All right.  I'm -- before I start

18   talking to both parties about the conditions, let me, then,

19   make the appropriate findings.

20        I mean, I do agree with the Government on this

21   and, I'm sure, the defendant.

22        I do agree -- first of all, this is a case in

23   which the rebuttable presumption of detention arises because

24   18 United States Code 3142(e)(C)(3) [sic] provides a

25   rebuttable presumption of detention if there is probable

1      cause to believe that a defendant committed, quote, An

2      offense listed in Section 2332b(g)(5)(B) of Title 18 for

3      which a maximum term of imprisonment of 10 years or more is

4      prescribed.  Here, the required probable cause exists

5      because the grand jury returned an indictment charging

6      Mr. Hughes with a violation of 18 United States Code 1361,

7      one of the offenses that is specifically enumerated in the

8      prior statute I mentioned.  And in cases such as this one

9      involving a charge or -- of alleged damage or attempt to

10     damage property of the United States in excess of $1,000,

11     that offense does carry a maximum sentence of 10 years in

12     prison.  And finally, return of an indictment makes

13     conclusive the existence of probable cause to hold the

14     accused for further prosecution.  That's a case, United

15     States v. King, 482 F.2d 768 at 776, a D.C. Circuit case

16     from 1973.  Thus, the rebuttable presumption does arise.

17             However, I also agree with the parties that after

18     considering all the factors in 18 United States Code

19     3142(g), the presumption is rebutted here, and I cannot say

20     that there's clear and convincing evidence that there are no

21     condition or combination of conditions that will reasonably

22     assure the appearance of the person as required and the

23     safety of any other person and the community, as I would

24     have to to detain the defendant under 18 United States Code

25     3142(e)(1).  In making this determination, I have to take

1    into account, as we've been discussing, the available

2    information concerning four factors that are set out in 18

3    United States Code 3142(g).  Those factors are the nature

4    and circumstances of the offense charged; the weight of the

5    evidence against the person; the history and characteristics

6    of the person, including a long list of -- including the

7    person's character, physical and mental condition, family

8    ties, employment, financial resources, length of residence

9    in the community, community ties, past conduct, history

10   relating to drug or alcohol abuse, criminal history, and

11   records [sic] -- and -- concerning his appearance at court

12   proceedings; and the nature and seriousness -- and, four,

13   the nature of serious -- and seriousness of any -- of the

14   danger to any person or the community that would be posed by

15   the person's release.  That's 18 United States Code 3142(g).

16        So since the parties agree here, I'm not going to

17   walk through every single relevant fact, but let me just hit

18   the highlights here why I agree with the Government -- agree

19   with the parties that there are going to be a set of

20   satisfactory conditions that allow for Mr. Hughes to be

21   released even in the context of his participation in the

22   breach of January 6th -- his alleged participation -- which

23   was a grave assault on our republic and on our peaceful

24   transfer of power in this country.

25        So while this defendant was among the first to

1    enter the Capitol that day and he did, (inaudible) -- as far

2    as the floor of the Senate itself, the Government proffers

3    that there is no evidence that he engaged in any violence

4    against any person or that he carried a weapon that day or

5    that he was wearing any type of tactical gear or that he

6    planned for or played a leadership role in the Capitol -- in

7    the siege and the riots that day; that he yelled at or

8    confronted law enforcement officers; that he celebrated the

9    interruption of the electoral count.  In fact, they say he

10   appears to have admonished another rioter to show some

11   respect by removing himself from the seat reserved for the

12   Senate's presiding officer.  He has no known convictions; he

13   is not a member of any group linked to violence or any group

14   that is alleged to have, sort of, tactically planned what

15   happened that day; he has strong ties to the area in which

16   he resides; he's shown remorse for his actions; and he

17   turned himself in to authority -- the authorities.

18           So with all of this in mind and, as Mr. Nelson

19   mentioned, with the guidance given -- the -- by the Court of

20   Appeals in the Munchel case, I do think that whatever risk

21   of danger to the community that Mr. Hughes presents, I

22   cannot find that it is so grave that it cannot be mitigated

23   with conditions, including those the parties have proposed.

24           So I will grant the motion, because I cannot find

25   by clear and convincing evidence that no condition or

1   combination of conditions will reasonably assure the

2   appearance of the person as required and the safety of any

3   other person and the community.

4          So let's talk -- have the parties discussed --

5          Mr. Nelson, have you discussed the conditions that

6   you've laid out in your motion with the -- with defense

7   counsel?

8          MR. NELSON:  No, Your Honor.  Candidly, I've not

9   had the opportunity to do that.

10          THE COURT:  All right.  Let me, then, just start

11   there.  Mr. Hoovestal, what -- is your client agreeable to

12   the conditions that the Government lays out in its motion?

13          MR. HOOVESTAL:  Yes, Your Honor.  Mr. Hughes

14   basically is a person who gets up in the morning; he goes to

15   work; he goes home at night.  He is not the kind of guy that

16   goes out to bars.  He's not a carouser.  He basically works

17   and hangs out with his family.  And so the conditions are

18   not, in and of themselves, objectionable.  I don't know that

19   they're, frankly, necessary.  But just to assure the

20   Government and the Court that he will abide by the

21   conditions that the Court would impose, we really have no

22   objection to them.  I don't think that they're going to be

23   any problem.

24          THE COURT:  All right.  So let me first talk to --

25   is Mr. -- we have Mr. Sidbury with us; correct?

1    THE PROBATION OFFICER:  That is correct, Your

2    Honor.

3    THE COURT:  All right.  Mr. Sidbury, can you --

4    first of all, can you confirm -- I think you had confirmed

5    this in a prior -- in a report that I received, but I think

6    -- we have -- the District of Montana can, and is able to

7    and is willing to, supervise this defendant and subject him

8    to electronic monitoring; is that correct?

9    THE PROBATION OFFICER:  Yes, Your Honor, but I

10   would have to call to discuss what type of electronic

11   monitoring is available.  We've been talking to a lot of

12   different jurisdictions and I actually am confused.  I do

13   believe that they may only do radio frequency supervision --

14   electronic monitoring; meaning, that they would only be able

15   to track the defendant when he's in the home.  I would have

16   to call and verify if they do have GPS available, but I want

17   to say that they don't.  So the only time that the defendant

18   would be tracked would be when he's in the home.

19   THE COURT:  So they'd be able to tell when he's

20   home, but they would not be able to tell where he is when he

21   is not home?

22   THE PROBATION OFFICER:  That is correct, Your

23   Honor, but I can get clarification for a Court -- for the

24   Court.

25   THE COURT:  Hmm.  Well, Mr. Nelson, does that

1    change -- I don't -- well, I don't think it changes the --

2    my assessment.  But does it change the Government's

3    assessment if that's all they have?

4              MR. NELSON:  Your Honor, I don't think so.  I

5    mean, I certainly -- given that the Court is not swayed,

6    I -- loath to say that I am, but I do think that if he is --

7    if it can be confirmed that he's abiding by the curfew,

8    then, you know, that is compliance, and I would say that

9    that's fine.

10             THE COURT:  Let's -- all right.  So let's just,

11   then, assume -- he'll be on location monitoring of some

12   kind.  If GPS is available, we'll make it GPS; if it's not

13   GPS, we'll default to whatever they have in the District of

14   Montana.

15             There would be a curfew.  So Mr. Hoovestal, what

16   is the --

17             And this would be, Mr. Nelson, instead of -- it

18   wouldn't be, then -- well, let me put it this way.  What --

19   is your recommendation -- you mentioned home detention with

20   curfew.  As I look and see what judges typically order,

21   there's a box for curfew and a box for home detention.  I

22   think my experience has been that the curfew is -- if we're

23   going to have -- we have someone with a job who wants to be

24   able to get back and forth to it every day -- well, you know

25   what?  Let me ask Mr. Sidbury.  We have him here.

1                Mr. Sidbury, when someone -- when we have a

2      defendant with a job, is it the preference of at least the

3      Pretrial Services folks to make it a curfew as opposed to

4      home detention just so that they can't -- so that they don't

5      have to be informing someone on your end all the time, I'm

6      going to work; I'm going to the same place, every day or

7      what -- if you -- we have someone --

8                First of all, Mr. Hoovestal, we have a defendant

9      here who has a job where he -- a regular job; correct?

10               MR. HOOVESTAL:  That's correct, Your Honor.  He

11     actually cleans commercial properties and residential

12     properties.  And so that would entail actually having to go

13     into a building like a, you know -- a business to perform

14     cleaning services which would require that he do that after

15     hours.  So we would request that the curfew be, like, 10:00

16     o'clock or, maybe, 11:00 o'clock at night, because he will

17     have to enter buildings after hours to perform those

18     cleaning services, particularly commercial entities.

19               THE COURT:  Well, when does the job -- so the job

20     can't begin until 6:00 in the evening?

21               MR. HOOVESTAL:  Well, it just depends on what he's

22     doing.  I know that he also does residential cleaning

23     services as well which he can do during the day.  So my

24     guess is that he begins work at probably 9:00 -- 8:00 or

25     more -- 8:00 or 9:00 o'clock in the morning and then works

1        throughout the day.

2                    (Brief pause.)

3                    THE COURT:  All right.  Let's give him a --

4                    (Brief pause.)

5                    Mr. Sidbury what, in this kind of situation, then,

6        would you recommend as far as a curfew or home detention?

7                    THE PROBATION OFFICER:  Your Honor, if you just

8        want the defendant to work, home detention would be the box

9        to check because that allows the defendant to work.  As long

10       as he's -- as long as he provides Pretrial Services in

11       Montana verification of his employment and his work

12       schedule, they will allow him to work, but that's the only

13       thing that he will be allowed to do.  If you're giving him a

14       curfew and saying it's a seven-day curfew, he has hours to

15       do other things other than work.  So if the Court is

16       inclined to allow the defendant to move around, curfew would

17       be more effective, but if the only thing that the Court

18       wants the defendant to do is work, the defendant will be

19       placed in home detention.  He will be allowed to go to work.

20       He would not be allowed to do other things other than, you

21       know, like, if he had a medical appointment or something of

22       that nature, but he wouldn't just --

23                    THE COURT:  Sure.

24                    THE PROBATION OFFICER:  -- be free to move around.

25                    THE COURT:  Yeah.  Exactly.  So I -- and I see the

1    list of things here that are listed on home detention.  It

2    includes medical, attorney visits, all sorts of other

3    things.  I don't see why we can't, then -- let's place the

4    defendant in home detention, then.

5          So there won't -- Mr. Hoovestal, I won't -- there

6    won't be a formal -- there won't be a curfew if he needs to

7    go out later or earlier.  He just has to make sure he only

8    goes out for work or any of these other reasons that he can

9    get permission to go, and whether that occurs later in the

10   evening or during the day, he's free to go do it as long as

11   he informs Pretrial Services.

12          MR. HOOVESTAL:  Yes, Your Honor.

13          THE COURT:  All right.  So we'll do that.

14          The other conditions that the Government lay out

15   here, a prohibition -- will also include a prohibition on

16   leaving the District of Montana without Court approval.  I

17   think that's agreeable.  Obviously, if there's some reason,

18   the parties can come to me and ask for that permission.

19   We'll do that.  I see that, in many cases -- well, that

20   obviates -- he wouldn't be able to come to the District of

21   Columbia if he's not able to leave the District of Montana.

22          Let me ask the Government, do -- what is the basis

23   for the random drug testing?  Is that -- is there need for

24   that in this particular case in -- Mr. Nelson, in your view?

25          MR. NELSON:  Well, Your Honor, I -- that was in

1    reference to Mr. Hoovestal's motion, and I would defer to

2    the Court on this just regard -- with regard to the

3    defendant's apparent use of marijuana as part of a medical

4    marijuana card that he was willing to give up while on

5    release.  And so I was just going to -- I floated -- I was

6    trying to agree with Mr. Hoovestal, but also float it to the

7    Court as to how best to handle it.

8              THE COURT:  All right.  Let's start him out with

9    the drug testing and, obviously, if, you know -- that's one

10   where, if -- many of them -- if he looks like he's on track,

11   we may suspend it in the future, but let's start out and go

12   ahead and do that.

13             And, obviously, removal of all firearms from the

14   residence.  Yes, he would not be able to possess -- whether

15   constructively possess in his home or possess for any other

16   reason -- a firearm.

17             Let's see.  Are there -- Mr. Sidbury, that's the

18   conditions the Government has requested.  I think -- let's

19   go ahead and -- let me ask you, Mr. Sidbury.  Are there any

20   other conditions of release that you think you would

21   suggest?

22             THE PROBATION OFFICER:  Two, Your Honor.  We

23   usually put on the release that the defendant comply with

24   courtesy supervision in that particular jurisdiction and, in

25   addition, to report to Pretrial Services as directed by that

1    agent.

2            THE COURT:  Yes, of course.  We would -- yes,

3    we'll include, of course, that.  Yes.

4            THE PROBATION OFFICER:  But other than that, Your

5    Honor, there are no additional conditions.

6            THE COURT:  All right.  Fair enough, then.  Let's

7    -- do you want to just -- let's put it this way.

8    Mr. Sidbury, do you want to go ahead and just explain to

9    Mr. Joshua Hughes the conditions we've just walked

10   through -- we just walked through, and then I'll have

11   Ms. Harris swear him to those conditions.

12           THE PROBATION OFFICER:  Mr. Hughes, you're going

13   to be released under the condition that you comply with the

14   supervision in Montana.  You will report to their office as

15   directed.  You are to abide by the following restrictions on

16   personal association or residence or travel.  You may not

17   leave the State of Montana without Court approval.  You will

18   be placed on home detention.  And, in addition, you will --

19   you must pay for all or part of the costs of the program

20   based on your ability to pay as determined by a Pretrial

21   Services Office or supervising officer.  You will be subject

22   to submit to testing for prohibited substance if required by

23   a Pretrial Services Office and that supervising office

24   [sic].  And you are not to possess a firearm or destructive

25   device or other weapon.

1          Do you understand those conditions?

2          DEFENDANT JOSHUA HUGHES:  Yes, sir.

3          THE COURT:  Thank you, Mr. Sidbury.

4          Ms. Harris?

5          THE DEPUTY CLERK:  Can you please raise your right

6    hand, Mr. Hughes -- Mr. Joshua Hughes.

7          Do you solemnly swear or affirm that you will

8    abide by the conditions of release as imposed by the Court?

9          DEFENDANT JOSHUA HUGHES:  Yes, ma'am.

10         THE DEPUTY CLERK:  Thank you.

11         THE COURT:  All right.  Mr. Hughes, let me just

12   say a few -- Mr. Joshua Hughes, let me just say a few words,

13   then, about these conditions.

14         You have to follow these conditions.  And if you

15   don't, the penalties for not -- for violating them can be

16   severe.  Most obviously, if you violate any of your

17   conditions of release, your release could be revoked and you

18   could be detained in prison, as you are now, pending trial.

19   You could also be subject to another prosecution for

20   contempt of Court.

21         Similarly, if you fail to appear for a subsequent

22   court appearance -- for a subsequent hearing in this case,

23   you could be subject to a fine or an imprisonment on top of

24   the sentences that you are potentially exposed to now by

25   being charged with the crimes you're charged with.  And any

1    term of imprisonment for your failure to appear would be

2    consecutive.  It would be on top of any -- the sentence

3    received for any other offense.

4              And finally, if you're convicted of an offense

5    while you are on release in this case, then in addition to

6    the sentence imposed for that new offense, you could be

7    sentenced for up to 10 years of additional imprisonment, and

8    any imprisonment for an offense committed while on release,

9    again, would be consecutive to the sentence received for any

10   other offense.

11             So Mr. Joshua Hughes, do you understand all of

12   that?

13             DEFENDANT JOSHUA HUGHES:  Yes, Your Honor.

14             THE COURT:  All right.  Very well.

15             All right.  Let's turn to Mr. -- is there anything

16   further, then -- let me just say to Mr. Nelson, is there

17   anything further, then, on Mr. Joshua Hughes that you think

18   I need to address here today?  I guess we'll talk about the

19   speedy trial in the end.  But anything else?

20             MR. NELSON:  No, Your Honor.  Thank you.

21             THE COURT:  All right.  Mr. Hoovestal, anything

22   else you think I need to address with regard to your client?

23             MR. HOOVESTAL:  Nothing from us, Your Honor.

24             THE COURT:  All right.

25             MR. HOOVESTAL:  Thank you.

```
 1                 THE COURT:  All right.  Let's now talk to -- let's
 2       move to Mr. Jerod Hughes.
 3                 We -- I have the parties' -- obviously, we had a
 4       discussion about him earlier -- or last week.  And the
 5       parties argued to me about how the Bail Reform Act applies
 6       to him, and you've now made some additional submissions.  I
 7       think the calculus for him is, obviously, somewhat
 8       different.  There are some differences presented.  I'm ready
 9       to rule on it, but I do -- I'm going to give each party, you
10       know, a few minutes if you want to address the submissions
11       you've already made.
12                 I guess it's your motion, Mr. Zucker.  Do you have
13       -- do you want to -- is there anything else you want to
14       address --
15                 MR. ZUCKER:  Yeah.
16                 THE COURT:  -- at this time?
17                 MR. ZUCKER:  Well, Judge, yes.
18                 THE COURT:  I'll give you five minutes; I'll give
19       Mr. Nelson five minutes.  You did -- you each did raise some
20       new points in your motion.  And I think, you know, what I
21       would focus on is what you perceive the differences are.  I
22       mean, we have an interesting comparator right here and there
23       are some differences.  Mr. Nelson's pointed out those
24       differences.  I think the question is whether those
25       differences warrant a different outcome.
```

1           MR. ZUCKER:  Very well, Judge, and I appreciate

2      the opportunity to respond.

3           And I really -- I stand by what I put in my

4      motion.  And I guess I want to respond first to Mr. Nelson's

5      supplement and thank him for that.  But what is interesting

6      in looking at that -- I guess, the first observation I want

7      to make is that Mr. Nelson points out that there's some

8      marijuana -- or allegations of marijuana use, and what I was

9      unaware -- I didn't know that was going to come up and I

10     just found out this morning -- is that Jerod Hughes also has

11     a medical marijuana card.  And marijuana is legal in

12     Montana, as it is in D.C.  Technically, it's still a federal

13     offense, but that seems to not be enforced in either

14     jurisdiction and probably not in any jurisdiction as far as

15     I know.  So that's a -- of de minimis concern for the Court.

16          And so in distinguishing between the two cases

17     here -- and I think it is right for comparison -- there's

18     really two things that are different between Jerod and

19     Joshua Hughes.  One is the criminal background, and I think

20     that's -- also needs to be put into perspective where we

21     have two felonies that arose out of substance abuse that

22     have been dealt with and doesn't seem to have risen its head

23     again, and then after that -- and then pretty much addressed

24     that in the motion -- after that, we have three misdemeanors

25     that are also, I would suggest, of minimal concern and

1    certainly don't present a danger to the community or aren't

2    indicative of a danger to the community.  And the standard

3    is still the same.  It has to be clear and convincing

4    evidence that his release poses an unreasonable danger to

5    either an individual or the community at large, and I don't

6    think those three misdemeanors say much into that.

7            And so then the only other distinguishing factor

8    between these two defendants based on the facts presented is

9    that one of them kicked the door and one of them didn't.

10   And I would say, given that is the sole distinguishing

11   factor, that, in the context of this case, does not present

12   the type of insurmountable danger to the community or an

13   individual within the community.  And I note it was not an

14   attack on a person.  It was a kicking of a door, and the

15   Court is aware of the circumstances.

16           So for those reasons, I would say that we don't

17   rise to the level of establishing that there are no

18   conditions that could protect the community from somebody

19   who, for all intents and purposes, the last 15, 20 years has

20   lived pretty much a law-abiding life.

21           The other thing that's just of -- I wanted to

22   observe -- and I'm not sure how the Court factors this into

23   the calculus -- but just the whole anomaly of how this case

24   arises.  The presumption -- or the rebuttable presumption

25   arises because Mr. Hughes is charged with a crime that

1    involved destruction of government property connected to

2    terrorism, and it's that whole link to terrorism that

3    creates the presumption, I think, in this case.  It's --

4    that's within 1342(e)(3).  And the anomaly here -- I see the

5    Court turning away --

6              THE COURT:  No, no, no, I'm sorry.  I just was

7    grabbing my book.  Go ahead.

8              MR. ZUCKER:  Sure.  Sure.  Sure.

9              Yeah, I -- and I -- when I read -- when I looked

10   through, it makes reference to the -- and it talks about

11   terrorism, and just the anomaly of the situation we're dealt

12   with here where somebody's accused by the Government of a

13   terrorist act for following the instructions and doing what

14   is requested by the President of the United States at the

15   time, and I don't know how we factor that into whether or

16   not this man puts -- presents a danger into the -- for the

17   community at large.  But I think the decision from the

18   Circuit suggests or, frankly, states that the Court needs to

19   consider the anomalous situation under which the whole

20   events of January 6th arose, and given how unusual that

21   event is, the probability that it will result in similar

22   conduct or similar actions in the future is also relatively

23   minimal.

24             So for those reasons, I'd ask the Court to -- and

25   principally for the Munchel decision, as well -- ask the

1   Court to recognize that there are conditions of release that

2   will effectively prevent the -- I'm sorry -- protect the

3   community from any danger that Jerod Hughes's release poses.

4   And, of course, the conditions would be similar to what is

5   imposed for the co-defendant, his brother, you know?  Go to

6   work and go home.  That would also address -- the only other

7   -- the other instances in which he seems to have gotten in

8   trouble in the last couple of years have been in,

9   essentially, for lack of a better word, bar room brawls, and

10  if he's not allowed to go -- if he's under a work curfew,

11  that's less likely to arise.

12              THE COURT:  Mr. Nelson?

13              MR. NELSON:  Thank you, Your Honor.

14              I respectfully disagree with Mr. Zucker.

15              First, I disagree that there's some requirement of

16  a showing of terrorism in this case, because the statute is

17  clearly -- it's delineated and that's what the book says.

18              As for his entrapment by estoppel argument, I

19  would defer to Chief Judge Howell on that.  Even if it can

20  be inferred that President Trump ordered the defendant or

21  told the defendant to kick -- break open windows and kick

22  open doors, he had -- didn't have legal authority to do

23  that.

24              THE COURT:  I can tell you, Mr. Nelson, that that

25  argument doesn't move the needle with me.

1          MR. NELSON:  Fair enough, Your Honor.  I just --

2          THE COURT:  All right.

3          MR. NELSON:  -- leave it unanswered.

4          THE COURT:  All right.

5          MR. NELSON:  But the real crux of this is whether

6     or not the defendant has rebutted the presumption, and I

7     submit that he has not, and there's two reasons why he has

8     not.

9          First of all, his argument that his activities on

10    the 6th rebut the presumption because he's less culpable

11    than others fail to take into account the fact that he's --

12    and I concede that we didn't have this information for Your

13    Honor at the detention hearing -- but his text messages in

14    advance talking about, you know, dropping the hammer and, We

15    stormed the Capitol, a celebration on all of those things

16    that Your Honor just mentioned a moment ago with regard to

17    the other defendant are present here.

18         Moreover, the defendant's criminal history, I

19    think, prevents him from rebutting the presumption because

20    we have two felony Controlled Substance Act -- or felony

21    controlled substance convictions.  They're state

22    convictions, not federal convictions.  And I get that those

23    are old, but they still exist, and they still would,

24    frankly, weigh into the defendant's criminal history for

25    sentencing.  And the three others, as I noted before,

1    disorderly conduct and assault, are exactly the type of

2    activity that suggests dangerousness to the community.

3          And so I don't think that the defendant has

4    rebutted the presumption.  And even if he has, the

5    presumption survives for the Court's consideration and,

6    considering all the other factors that were already raised,

7    I think that the 34 -- 142 [sic] factors would weigh in

8    favor of detention.  They perhaps don't weigh so

9    overwhelmingly in favor of detention as they might in other

10   cases, but I think that there is clear and convincing

11   evidence, Your Honor.

12         THE COURT:  All right.  Well, I do think, you know

13   -- again, I think the -- it's interesting to have the case

14   of Joshua Hughes next to Jerod Hughes.

15         I do think the calculation is different here.

16   Obviously, there are some differences between the two of

17   them, but ultimately I actually don't think those

18   distinctions make a difference in terms of release, and I'm

19   going to order him released under the same -- essentially,

20   the same conditions.

21         I do think it's -- I want to explain why, and I do

22   want to -- I take, Mr. Nelson, your point.  I actually think

23   the closest -- just analytically, the closest call in all of

24   this is whether the presumption is rebutted.

25         I -- let me just -- so let me just set this up by

1    mentioning, again, the Bail Reform Act.  The Bail Reform Act

2    requires release of a defendant prior to trial unless a

3    judicial officer determines after a hearing by clear and

4    convincing evidence that no condition or combination of

5    conditions will reasonably assure the appearance of the

6    person as required and the safety of any other person and

7    the community.  And in making this determination, I have to

8    take into account the four factors I mentioned before: the

9    nature and circumstances of the offense charged; the weight

10   of the evidence against the person; the history and

11   characteristics of the person; and the nature and

12   seriousness of the danger to any person or the community

13   that would be posed by the person's release.

14        This is a case, like his co-defendant's, in which

15   the rebuttable presumption of detention does arise for the

16   reasons I explained before.  The grand jury has returned an

17   indictment charging him with a violation of 18 United States

18   Code 1361, one of the offenses that is specifically

19   enumerated in 18 United States Code 2332b(g)(5)(i) [sic].  I

20   don't believe, as -- there is another issue about terrorism

21   and detention that comes up in some of these cases, but this

22   -- in this case, it does not turn on the other prong which

23   is -- concerns whether this is a federal crime of terrorism.

24   And in such cases as this one involving a charge of alleged

25   damage or attempted damage to property in excess of $1,000,

1    that offense carries a maximum sentence of 10 years'

2    imprisonment -- in prison.  And the return of the

3    indictment, as I mentioned earlier, makes conclusive the

4    existence of probable cause to hold the defendant.

5              So then it turns on -- the question is, how do I

6    weigh those four factors, and what the effect of the

7    rebuttable presumption is.

8              First, I have to look to the nature and

9    circumstances of the offense charged.  And as one way to

10   look at this, you know, Chief Judge Howell laid out in the

11   Chrestman case a number of factors that courts can weigh to

12   look at dangerousness and pretrial detention, and those

13   factors include whether a defendant has been charged with

14   felonies or misdemeanors; whether he engaged in prior

15   planning before arriving at the Capitol; whether he carried

16   or used a dangerous weapon during the riot; whether he

17   coordinated with other participants before, during, or after

18   the riot; whether he assumed a formal or informal leadership

19   role in the assault by encouraging others' -- rioters'

20   misconduct; and the nature of the defendant's words and

21   movements during the riot, including whether the defendant

22   damaged federal property, threatened or confronted law

23   enforcement, or celebrated efforts to disrupt the

24   certification of the Electoral College vote.

25             Jerod Hughes, along with his brother, was among

1    the first group to enter the Capitol.  And he is similarly

2    situated to his brother insofar as there's no evidence that

3    he engaged in any violence against any person; that he

4    carried or used a weapon that day; that he wore tactical

5    gear; that he destroyed any property, obviously, with the

6    exception of the door that we're -- that he's charged with

7    damaging; or that he was a member of any of the groups that

8    were alleged to have done significant planning for what

9    happened on January 6th.  And so those factors insofar as

10   they go weigh against detention and for release.

11          On the other hand, the Government draws some

12   distinctions between what the two of them did that day by

13   proffering a few things.  One is that Jerod reviewed some

14   documents that were laid out in the Senate chamber;

15   obviously, the one we've been talking about, that he kicked

16   a door to the Capitol open, both damaging it -- and so he's

17   -- that is, (inaudible) -- a violent act; and that he

18   allowed others, by that act, to enter the Capitol.  That's

19   not insignificant here.  In their papers relating to Joshua

20   Hughes, the Government also tries to draw this

21   distinction -- I'm not sure it's well sketched out -- but

22   between the brothers' actions vis-à-vis Officer Goodman

23   suggesting that Jerod engaged the officer and Joshua did

24   not.  Looking at the photos and the video, I don't see a

25   huge difference there, but they try to make that argument.

1     And in its supplement, the Government offered evidence of

2     what it suggested was planning and a lack of remorse

3     afterward by Jerod Hughes.

4          And so I -- look, I think these are legitimate

5     distinctions to draw in terms of, you know -- to the extent

6     the proffers are accurate -- and they are only proffers

7     now -- they do suggest that Jerod Hughes was the more -- was

8     more culpable in the end for what happened that day.  But

9     the question for me is not, you know -- is whether they make

10    a difference in terms of this factor and whether,

11    ultimately, they make a -- the nature and circumstances of

12    the offense -- whether they make a difference for purposes

13    of detention.

14         I don't find, you know, that -- Jerod glanced at

15    documents on the Senate -- in the Senate floor.  It doesn't

16    really move the needle for me one way or the other.  In

17    fairness, the Government hasn't really pressed that

18    distinction very much here.  Same thing with the issue with

19    Officer Goodman.  I think that both brothers were, sort of,

20    behind another rioter who really engaged Officer Goodman

21    directly.  Neither brother appears to have done anything

22    like that from the photos that I've seen.

23         The planning evidence is not insignificant, but

24    it's certainly far short of the type of evidence that the

25    Government has proffered in other cases in which -- in other

1    cases.  Obviously, Mr. Hughes -- Jerod Hughes did not end up

2    in Washington, D.C., on January 6th by accident.  He had a

3    plan to do so.  He had to get in the car and drive and

4    etcetera.  And, in that sense, so did Joshua Hughes.  And

5    the evidence, though, of what Jerod came for -- what he came

6    to do is somewhat vague about -- in terms of what he thought

7    he would do exactly on that day.  There's no evidence that

8    Jerod -- or Joshua, for that matter -- coordinated with

9    others to, kind of, tactically plan the siege of the Capitol

10   in the way that the Government has proffered in other cases.

11   And I would say some of the messages the Government offers

12   in its most recent filing are even somewhat exculpatory even

13   insofar as Jerod Hughes denies destroying things, denies

14   fighting the cops, and characterizes those types of actions

15   as crazy.

16          No doubt, it is significant that he kicked that

17   door open and caused damage to it.  And it is significant,

18   as the Government had pointed out, that he expressed a

19   desire to hold the building in retrospect in some way.

20   That's more than troubling.  And I don't want to understate

21   the gravity of the collective offense and the assaults that

22   happened on the peaceful transfer of power that day.  And

23   both brothers are charged now with very serious crimes that

24   subject them to serious penalties.  But I do think on

25   balance, the evidence proffered by the Government does not

1    implicate many of the most serious factors that the

2    Chrestman court laid out to distinguish between the

3    dangerousness of various defendants in terms of weapons; the

4    use of violence particularly against people and particularly

5    against law enforcement; and, for example, planning and

6    coordination with others.  So I would say the, you know --

7    perhaps just because of the overall nature of this -- what

8    happened that day, we might say that this factor laid --

9    leans in favor of detention, but if it does, it does so only

10   marginally.

11          I won't go into the issue -- in the Government's

12   original papers, they asked me, and I have to weigh, whether

13   this is a crime of violence, and there's -- under the

14   statute, and there's a roiling debate about whether it --

15   this felony destruction of property is a crime of violence

16   or not.  I would just say, whether it ends up being labeled

17   that or not, it does not matter one way or the other.  My

18   decision here is not going to turn on that one way or the

19   other.  So I'm not going to decide that question.

20          The second factor is the weight of the evidence

21   against the defendant.  And, you know, as far as the conduct

22   Jerod Hughes is accused of, the weight of the evidence is

23   strong insofar as the -- much of it is captured on photos

24   and video.  On the other hand, in a case -- versus -- United

25   States v. Lee -- F -- 1 -- F -- 195 F. Supp. 3d 120 at 129;

1    it's a D.D.C. case from 2016 -- the court noted that courts

2    in other Circuits have cautioned that a District Court, in

3    assessing the weight of the evidence, must not consider the

4    weight that -- consider the evidence of a defendant's guilt

5    but consider only the weight of the evidence of the

6    defendant's dangerousness.  So I mean, ultimately, the

7    question here on detention is dangerousness.  And whether

8    that factors in here in this way exactly or not, the reality

9    is, just looking at it from a question of dangerousness as

10   to his activity, looking at the destruction of property

11   charge which is the reason we're arguing about a rebuttable

12   presumption or detention and really is the only violence

13   that the defendant is directly accused of, you know, it is

14   clear that Mr. Hughes kicked the door, no question, although

15   the extent of the damage to that door is less clear.  And

16   while it may not matter in terms of his criminal -- his

17   culpability for this crime or whether he's ultimately --

18   yeah -- whether he's ultimately culpable for it, it does not

19   appear that he intended to damage the door which, I think,

20   is somewhat relevant in assessing dangerousness and the

21   weight of the evidence in terms of dangerousness.

22           So this factor -- I would say, if the prior factor

23   weighs slightly in favor of detention, I think this factor,

24   if we're focused on dangerous [sic], probably weighs

25   slightly in favor of release.

1            The third factor is the history and

2    characteristics of the defendant.  And, like his brother,

3    Jerod Hughes had certain factors in common with his brother.

4    The defense proffers he has strong ties to the area where he

5    resides.  He resides in Montana with his wife and teenage

6    daughter.  Much of his extended family also lives in the

7    area, and they have described him as dependent -- dependable

8    and reliable.  And the defense also proffers that he's

9    gainfully employed in a full-time job and provides

10   substantial caregiving for his wife who is disabled.  He is

11   not a member of any group linked to violence.  And, again,

12   like his brother, he turned himself in to the authorities.

13            I think the Government, again, presses two key

14   distinctions here.  One is his criminal history -- we've

15   talked about it -- two felony drug charges about 6 months

16   apart about 15 years ago.  And I think -- as I mentioned

17   before, I think it's significant that one offense was

18   committed while on release for an earlier one which suggests

19   issues complying with conditions of release.  Moreover, the

20   -- we mentioned the two [sic] misdemeanors, two for

21   disorderly conduct and one for assault, and two of those are

22   much more recent, 2013 and 2015 when they occurred.

23            The second piece, to the extent it's separate from

24   this issue of criminal history, is evidence showing that

25   Mr. Hughes is a user and perhaps grower of marijuana.  And

1    Mr. Zucker has, to some degree, explained that; mitigated

2    it, maybe, somewhat with this issue of that -- proffering

3    that his client has a medical marijuana card issued by the

4    State of Montana.  Obviously, marijuana does remain illegal

5    under federal law.  But I think -- again, in assessing

6    dangerousness, certainly in assessing whether the defendant

7    could comply with conditions of release, I think it is not

8    unreasonable to consider the fact that it is apparently

9    legal in Montana under this regime and the defendant at

10   least asserts that -- proffers that he's following that

11   regime.

12           So I think, you know, all in all, these two

13   distinctions are certainly relevant to the analysis here and

14   it's fair that the Government points them out.  They

15   certainly call into question whether the defendant will be

16   able to follow his conditions on release from a variety of

17   angles, although it appears almost all of them are related

18   in one way or the other to substance abuse problems which is

19   mitigating to some degree.  On the other hand, Jerod Hughes

20   has no felony convictions -- he's had no felony convictions

21   for about 15 years, and he has never been convicted of a

22   violent felony.

23           So on the whole, I don't think this record

24   suggests a very high level of dangerousness to the

25   community.  And, you know, one of the things that the court

1    emphasized in Munchel -- the Circuit emphasized in Munchel

2    was that it's not enough for the Government to raise serious

3    doubt about whether the defendant can comply with conditions

4    -- will comply with conditions of release.  That's, sort of,

5    a -- maybe, a necessary but not sufficient factor to holding

6    someone pretrial.  It's also got to be -- the focus has to

7    also be on what would happen if the person didn't follow the

8    conditions and the level of dangerousness that that

9    presents.

10           So I think, again, on the whole, this factor

11   weighs, again, in favor of release, again, but only

12   slightly.

13           And finally, I have to consider the nature and

14   seriousness of the danger to any other person or the

15   community that would be posed by the defendant's release.

16   And, I guess, as I've -- as, sort of, shot through in what

17   I've already mentioned here, I do think that focusing on

18   danger, whatever danger that would be posed by the

19   defendant's release can be mitigated by conditions of

20   release.  And if he violates them, you know, he'll be

21   detained.  So this, I do believe, again, weighs in favor of

22   release.  And, again, I turn to the Munchel case in which

23   the Circuit reminded us all that we're talking about -- I

24   have -- I'm -- what -- the Government's burden is to show

25   that there's an identified and articulable threat going

1       forward here, and I don't think I can find that.

2               Back to the rebuttable presumption.  That doesn't,

3       as the parties know, operate to guarantee detention.  It is

4       exactly that, rebuttable.  And the presumption operates at a

5       minimum -- this is United States v. Alatishe, 768 F.2d 364,

6       a D.C. Circuit case from 1985 -- the presumption operates at

7       a minimum to impose the burden of production on the

8       defendant to offer some credible evidence contrary to the

9       statutory presumption.  And back to that Lee case I

10      mentioned earlier, while the burden of production may not be

11      heavy, the defendant must proffer at least some evidence or

12      basis to conclude that the case falls outside the

13      congressional paradigm giving rise to the presumption.

14              I do think, as I mentioned earlier, in this entire

15      analysis, the closest call in a way is whether the

16      presumption is rebutted.  But I do think it has been

17      rebutted, given the evidence of violence on January 6th that

18      this defendant undertook which is -- I'll call it quite

19      modest; the fact that he has no felony convictions for 15

20      years; the fact that he has had no felony convictions at all

21      for violent conduct.  In light of all of those things, I do

22      think the presumption is rebutted.  And even though the

23      presumption doesn't drop out -- it remains in the case, as

24      the Government says, weighing in favor of detention -- I do

25      think the Bail Reform Act factors weigh ever so slightly

1    perhaps in favor of release as three of the four factors

2    weigh in favor of release.

3          And so because I don't think the Government was

4    able to show by clear and convincing evidence that no

5    condition or combination of conditions will reasonably

6    assure the safety of any other person and the community, I

7    will release Jerod Hughes with conditions and an appearance

8    bond.  And I don't see any reason why those conditions

9    shouldn't be precisely the same conditions that we've

10   already discussed for his co-defendant.

11         Mr. Nelson, what's the Government's view on that?

12         MR. NELSON:  I agree with Your Honor, Your Honor.

13         THE COURT:  All right.  Mr. Zucker, any problem

14   with that?

15         MR. ZUCKER:  No, I just think we need to clarify.

16   He has a different work schedule and --

17         THE COURT:  Well, the work schedule -- I think

18   because I'm not using the curfew route -- because we're just

19   -- he's going to be in home detention.  He's going to be

20   able to leave his home for a list of delineated purposes,

21   including work, but not, for example, to go grab a drink at

22   the bar, and as long as he has the permission of Pretrial

23   Services and lets them know, I'm going to work, and whenever

24   that work is, if they can account for him, then he's

25   permitted to go.  So I don't think we have --

```
 1              MR. ZUCKER:  Okay.

 2              THE COURT:  -- to bake in a time issue.

 3              Obviously, the drug testing is just as appropriate

 4    here.  I don't -- I think the conditions would match up.

 5              So Mr. Sidbury, do you want to explain those same

 6    conditions to Mr. Jerod Hughes.

 7              THE PROBATION OFFICER:  Yes, Your Honor.  Also, I

 8    would like to put on the record that I have verified that

 9    Montana does not have GPS monitoring.  It's only radio

10    frequency.  I will definitely put that information on the

11    release order, as well.

12              THE COURT:  Again, so they'll know -- he'll have

13    to tell -- just to be clear for me, for counsel, for the

14    defendants, they'll let Pretrial Services know, Okay.  I've

15    -- I'm going to work.  I go to -- I'm going to work here at

16    this time.  I'll be back at that other time -- at some other

17    time.  Obviously, Pretrial Services can verify that, if they

18    so choose, and they'll be able to tell basically when they

19    come and go from where they're living and when they get, you

20    know -- when they get -- they'll have to be back at the time

21    they say they're back.  And, again, if they choose to -- if

22    there's some other medical emergency or the other exceptions

23    to being in home detention, they simply have to let Pretrial

24    Services know where they're going and what they're doing and

25    why, get their permission, and then go from there.  Is that
```

1    accurate?

2              THE PROBATION OFFICER:  That is correct, Your

3    Honor.

4              THE COURT:  Okay.  Very well.

5              THE PROBATION OFFICER:  Mr. Hughes, you're being

6    released under the courtesy supervision in the District of

7    Montana.  You will have to remain in the -- Montana.  Any

8    travel outside of the District of Montana must be approved

9    by the Court.  You will be placed on home detention.  You'll

10   be restricted to your residence at all times except for

11   employment, education, religious services, medical,

12   substance abuse or mental health treatment, attorney visits,

13   court appearances, Court ordered obligations, or other

14   activities approved in advance by a Pretrial Services Office

15   and/or a supervising officer.  You must pay for all or part

16   of the costs of the program based on your ability to pay as

17   determined by the Pretrial Services Office or supervising

18   officer.  You must comply with courtesy supervision in the

19   District of Montana.  You must report to the District of

20   Montana as directed by PSA in the District of Montana.  And

21   you will be monitored by radio frequency electronic

22   monitoring.

23             Do you understand those conditions?

24             DEFENDANT JEROD HUGHES:  Yes, sir.

25             THE COURT:  All right.  Ms. Harris?

```
 1              MR. ZUCKER:  Judge --

 2              THE DEPUTY CLERK:  Would you please raise your

 3     right hand, Mr. Jerod Hughes.

 4              Do you solemnly swear or affirm that you will

 5     abide by the conditions of release as imposed by the Court?

 6              DEFENDANT JEROD HUGHES:  I do.

 7              THE DEPUTY CLERK:  Thank you.

 8              DEFENDANT JEROD HUGHES:  Yes, ma'am.  Thank you.

 9              THE PROBATION OFFICER:  Your Honor --

10              THE COURT:  All right.

11              THE PROBATION OFFICER:  -- I'm sorry.  I omitted

12     to submit to the substance abuse drug testing.

13              THE COURT:  Ah, okay.  Mr. Hughes, you understand

14     you're going to be drug tested as well and that's a

15     condition of your release?

16              DEFENDANT JEROD HUGHES:  Yes, Your Honor.

17              MR. ZUCKER:  Judge, Jon --

18              THE COURT:  All right.

19              MR. ZUCKER:  -- Zucker here.  For clarification --

20     I know I've confronted this before -- he does have a medical

21     marijuana card, I've been informed.  I assume, because of

22     that, testing for marijuana will not be a violation.

23              THE COURT:  No, I would not assume that at all.

24              MR. ZUCKER:  Well, then, let's let him know that

25     and --
```

1          THE COURT:  Yeah, I think that's -- Mr. Zucker,

2    you are right to point this out.  You are -- you would be

3    wrong to assume that it would not be a violation, but you

4    would be right to want to raise this.  So --

5          MR. ZUCKER:  I am raising it.

6          THE COURT:  Yeah.  No, I understand.

7          Just so both of you understand -- both

8    Mr. Hugheses -- it is a violation of your conditions of

9    release to violate federal law, and smoking, possessing --

10   possessing, I guess -- marijuana is a violation of federal

11   law.  So you will not want to be doing that while you are on

12   release in this case.  Is that understood?

13         DEFENDANT JEROD HUGHES:  Yes, Your Honor.

14         DEFENDANT JOSHUA HUGHES:  Yes, Your Honor.

15         THE COURT:  All right.  Let the record reflect

16   both defendants said -- responded in the affirmative there.

17         All right.  Mr. Jerod Hughes, same admonition I

18   gave your brother.  The penalties for violating your

19   conditions of release can be severe.  For example, most

20   obviously and most commonly, if you violate any of your

21   conditions, your release could be revoked and you could be

22   detained, then, in jail -- in prison pending trial.  You

23   could also be subject to a separate prosecution for contempt

24   of Court.  You can also -- if you fail to appear for a

25   subsequent court hearing, you could be subject to a fine or

1    imprisonment on top of the sentences you're exposed to now

2    for the offenses that you've been charged with.  And any

3    term of imprisonment for your failure to appear would be

4    consecutive.  That would be tacked onto the sentence that

5    you might receive if you were to receive a sentence for any

6    other offense.  And if you're convicted of an offense

7    committed while you are released, then in addition to the

8    sentence imposed for that offense, you could be sentenced

9    for up to 10 years of additional imprisonment, again,

10   consecutive to the sentence in that case.

11            Do you understand, Mr. Hughes?

12            DEFENDANT JEROD HUGHES:  Yes, Your Honor.

13            THE COURT:  All right.  Very well.

14            What do the parties want to do as far as

15   scheduling a next date in this matter?  We do have -- well,

16   yeah.  Have the parties discussed what they'd like to do?

17            MR. NELSON:  Your Honor, I'll speak for myself.

18            We have not had a chance to really speak as to

19   definitive dates.  I have begun the process of gathering

20   discovery for Jerod Hughes, as he was in this District

21   first, but there is a fairly voluminous amount of discovery

22   to gather and distribute to the defendants.  So I would

23   defer to them and to the Court as to when the next date

24   should be, but given the -- what we will be doing in the

25   meantime, I would suggest that the Speedy Trial Act should

1    be waived in the interim.

2          THE COURT:  Mr. Zucker, I guess I'll start with

3    you.  I have, you know -- there's always a balance here.  I

4    understand defense counsel wanting to, sort of, keep on top

5    of things and -- me to keep on top of things and make sure

6    that discovery continues to flow and if there are any

7    problems, that I'm available to resolve them.  On the other,

8    you know -- so what is your suggestion?  I -- in some of

9    these cases, I've gone so far as to continue them for 60

10   days and then ask for the parties -- what I've done at

11   defense counsel's request is ask the parties to give me a

12   written report in 30 days just to, sort of, let me know

13   things are going fine and discovery -- there aren't any

14   outstanding issues so the case doesn't get lost in the

15   shuffle or we could come back sooner, but that's one idea.

16   The -- part of it might be depending on how long you're

17   willing -- you think it's appropriate to waive the speedy

18   trial clock at this point.

19         MR. ZUCKER:  I have not discussed that with

20   Mr. Hughes, Judge, but my recommendation to him would be

21   that we waive the speedy trial clock.  And in view of the

22   standing order -- which, I think, has been extended again --

23   it's going to be waived anyway or can be waived anyway.  It

24   should be waived anyway.  I take Mr. Nelson at his word.

25   When he tells me it's going to be voluminous, I know it's

1    going to be voluminous.  And I -- I'm -- don't anticipate

2    any problems with him producing discovery.  I've known him

3    to be diligent.  So my inclination would be to put it off

4    for 60 days, and possibly into 90 days, or to say let's put

5    it off for 60 days with the understanding if the parties

6    say, you know -- agree we probably need another 30 to

7    review, we just do so by a consent motion or even just an

8    email to the Court, if that's agreeable to everybody else.

9               THE COURT:  All right.  Mr. Hoovestal, what is

10   your feeling on this?

11              MR. HOOVESTAL:  Your Honor, the standard practice

12   in the District of Montana is to receive a scheduling order

13   as a matter of course from the court.  I'm not sure what the

14   District of Columbia does, but I will obviously do whatever

15   is the practice of the Court.  And so if I hear both parties

16   -- both counsel, Mr. Nelson and Mr. Zucker, saying that

17   that's what they recommend, I'm pretty sure that I'll agree

18   with whatever they agree to.

19              THE COURT:  All right.  Yeah, we -- in this

20   jurisdiction, we don't typically enter a scheduling order

21   right off the -- right out the bat.  Typically, there's a

22   period of time where, especially -- I mean, this is your --

23   this is your defendant's -- your client's first appearance.

24   There's at least some period of time where the parties are

25   willing to waive speedy trial -- particularly in a case like

1    this with voluminous discovery, put that aside, but even in

2    a more -- a case where we don't have the voluminous -- the

3    extensive discovery here -- and there's a period of time

4    where, for a time or two, the parties will waive speedy

5    trial and come back and then go ahead and, kind of, see

6    where they are in terms of what -- is this case headed for a

7    trial?  Is it headed for some other kind of resolution?

8           We've been, you know -- I've been -- I think the

9    Government has a pretty good argument that, given the

10   extensive, kind of, discovery we have in this case that

11   there's an ends of justice -- interests of justice

12   continuance at least for, you know, a chunk of time.

13   Mr. Zucker has also indicated we only have a very small --

14   we -- trials are happening in our courthouse, but they are

15   happening under -- on a great -- greatly reduced capacity

16   and only in situations where folks can also even all get

17   here and feel comfortable, with their own health situation,

18   proceeding.  So I mean, even apart from the voluminous

19   discovery, there is a -- sort of, a -- an order that waives

20   speedy trial if the parties -- if we can't, basically,

21   accommodate that trial within this smaller funnel for trials

22   that we have right now.  Put it that way.

23          But even before we get to that, you know, I'm

24   inclined to grant a speedy trial -- an interests of justice

25   waiver for -- whether it's 30 or 60 days.  If the parties

 1    are comfortable with it, I'll do it for 60.  Mr. Zucker can

 2    -- you all can let me know if -- if you need my attention

 3    for some reason, you know where to find me.  My thought is

 4    do it for 60 days and we'll come back and we'll see where

 5    things are, where discovery is, and where you all want to --

 6    how you all want to handle things going forward where you

 7    see the case headed.

 8              Mr. Hoovestal, what do you think of that?

 9              MR. HOOVESTAL:  I agree, Your Honor.  I think that

10    that's appropriate.

11              THE COURT:  All right.  Ms. Harris, can you give

12    us a date 60 days out.

13              (Brief pause.)

14              THE DEPUTY CLERK:  That will be Wednesday, April

15    7th -- I mean -- I'm sorry, April 7th -- that will be

16    Sunday, June 6th.  So Monday, June 7th.

17              THE COURT:  All right.  Let's -- well, let's push

18    it one more day, because I would rather have it in the

19    afternoon and I see that I have something in the afternoon

20    on that day already.

21              So let's say -- is the Government available at

22    2:00 o'clock on June 8th?  Tuesday, June 8th.

23              MR. NELSON:  Yes, Your Honor.

24              THE COURT:  All right.  Mr. Zucker?

25              MR. ZUCKER:  Yes, sir.

1          THE COURT:  Mr. Hoovestal?

2          MR. HOOVESTAL:  Yes, Your Honor.  It looks like I

3    am.

4          THE COURT:  Okay.  And that will -- having it in

5    the afternoon might be a little better for you as well,

6    given the time difference.

7          All right.  So let's set it over until then.

8          I will go ahead, then, and find that the time

9    between today's date and June 8th is excludable under the

10   Speedy Trial Act because the ends of justice that are served

11   by taking such action outweigh the best interests of the

12   public and the defendants in a speedy trial.  I'm doing so

13   here to give the defendants the opportunity to receive

14   discovery in this matter -- and in particular, the

15   Government has made representations about how voluminous the

16   discovery will be -- but for the defendants to receive

17   discovery, for them to have the opportunity to consult with

18   their lawyers, and for all the parties to determine how the

19   case is likely to proceed.  And, again, it's especially so

20   in a case like this where the discovery is anticipated to be

21   quite voluminous.  And I'm doing so also in part because

22   both defenses -- defense -- defendants have consented to

23   that.

24         Is there anything further, Mr. Nelson, you think I

25   need to address here today?

```
 1              MR. NELSON:  No, Your Honor.  Thank you.
 2              THE COURT:  All right.  Mr. Zucker, anything
 3       further from you?
 4              MR. ZUCKER:  Nothing with the Court.  If
 5       Ms. Harris could put us in a lockout [sic] room so we could
 6       talk or, if she can't, if I could just get the phone number
 7       over at the --
 8              THE COURT:  All right.
 9              MR. ZUCKER:  -- institution, I'll call Mr. Hughes
10       right away.
11              THE COURT:  There may be a way to -- I know that
12       there's someone that has this line after us.  So I don't
13       think you'll have any time.
14              MR. ZUCKER:  Okay.
15              THE COURT:  If we can -- I think Ms. Harris may be
16       able to -- once we're off a public line here, if you want to
17       get that phone number, I think they can facilitate that.
18              Mr. Hoovestal, anything from you?
19              MR. HOOVESTAL:  Nothing from us, Your Honor.
20       Thank you very much.
21              THE COURT:  All right.  Very well.  We'll see
22       everyone in 60 days.  Until then, the parties are dismissed.
23              MR. ZUCKER:  Thank you, Judge.
24              MR. NELSON:  Thank you, Your Honor.
25              (Proceedings concluded at 1:21 p.m.)
```

51

1                    * * * * * * * * * * * *

2              CERTIFICATE OF OFFICIAL COURT REPORTER

3         I, TIMOTHY R. MILLER, RPR, CRR, NJ-CCR, do hereby

4    certify that the above and foregoing constitutes a true and

5    accurate transcript of my stenographic notes and is a full,

6    true and complete transcript of the proceedings to the best

7    of my ability, dated this 15th day of September 2021.

8         Please note:  This hearing occurred during the COVID-19

9    pandemic and is, therefore, subject to the technological

10   limitations of court reporting remotely.

11                          /s/Timothy R. Miller, RPR, CRR, NJ-CCR
                            Official Court Reporter
12                          United States Courthouse
                            Room 6722
13                          333 Constitution Avenue, NW
                            Washington, DC 20001
14

15

16

17

18

19

20

21

22

23

24

25