UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES

     v.                            Crim. No. 21-cr-106 (TJK)

JEROD HUGHES

     Defendant.

## MOTION TO DISMISS COUNT TWO
## OF THE SECOND SUPERSEDING INDICTMENT

Defendant through counsel, hereby moves the court to dismiss count two of the second superseding indictment ("indictment") charging him with obstructing an official proceeding and aiding and abetting in violation of 18 United States Code §§1512(c)(2) and 2.[1]  Because defendant's alleged conduct falls outside the scope of the charged obstruction statute, dismissal is warranted.

**Background**

On January 1, 2021, defendant was charged in nine counts arising from events at the Capitol on January 6, 2021.  Of relevance to the instant motion is Count Two.

## **COUNT TWO**

---

[1]  Hughes previously moved to dismiss count two of the original indictment.  ECF No. 37.  The court denied that motion on January 7, 2022, by minute order.  The language of Count Two of the Second Superseding Indictment is not identical to that of the original indictment and the ground raised for dismissal is different than those previously raised.

On or about January 6, 2021, within the District of Columbia and elsewhere, **JOSHUA CALVIN HUGHES** and **JEROD WADE HUGHES**, attempted to and did, corruptly obstruct, influence, and impede an official proceeding, that is, a proceeding before Congress, specifically Congress's certification of the Electoral College vote as set out in the Twelfth Amendment to the Constitution of the United States and 3 U.S.C. §§ 15-18.

Second Superseding Indictment, EFC No. 53 at 2. The indictment provides no other facts in support of this count.

The statute Mr. Hughes is charged with violating, 18 U.S.C. § 1512(c)(2), provides:

(c) Whoever corruptly—

(1) alters, destroys, mutilates, or conceals a record, document, or other object, or attempts to do so, with intent to impair the object's integrity or availability for use in an official proceeding; or

(2) otherwise obstructs, influences, or impedes any official proceeding, or attempts to do so, shall be fined under this title or imprisoned not more than 20 years, or both.

18 U.S.C. § 1512(c).[2]

**Legal Standards**

_____

[2]  Count Two also charges a violation of 18 U.S.C. § 2 which provides that anyone who "commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal." 18 U.S.C. § 2(a). In the context of Count Two, a violation of § 2 is thus dependent on some violation of § 1512(c)(2)—the only offense against the United States charged in Count II.

A criminal defendant may move, prior to trial, to dismiss a charge based on a defect in the indictment. Fed R. Crim. P. 12(b)(3)(B). "The operative question is whether the allegations in the indictment, if proven, permit a jury to conclude that the defendant committed the criminal offense as charged." *United States v. Akinyoyenu,* 199 F. Supp. 3d 106, 109 (D.D.C. 2016).   The Court must base its analysis only on the language charged in the Indictment and the language of the statute alleged to have been violated.  *Id*. at 109–10 (collecting citations).  When considering the language used in Count Two and the language of the statute, dismissal is warranted.

### Section 1512(c)(2) is limited to conduct impairing the integrity of evidence in an official proceeding

Defendant contends that the obstruction statute should be construed such that §1512(c)(1) limits the scope of §1512(c)(2). In other words, since §1512(c)(1) is tailored to evidence spoliation, and specific examples enumerated prior to a residual clause are typically read as refining or limiting the broader catch-all term used in the residual clause, § 1512(c)(2) is limited to conduct that impairs the integrity and availability of evidence in an official proceeding.

In a recent opinion issued in another January 6th case,[3] Judge Nichols conducted a thorough analysis of §1512(c).  *Exhibit 1,* 10-28.

---

[3]  *United States v. Miller,* 1:21-cr-00119 (CJN).

He ruled that,

> there are two plausible interpretations of the statute: either
> §1512(c)(1) merely includes examples of conduct that violate
> §1512(c)(2) or that §1512(c)(1) limits the scope of §1512(c)(2). The
> text, structure and development of the statute over time, suggest that
> the second reading is the better one.

*Id.,* at 28. However, because the first interpretation was also plausible, Judge

Nichols relied on the traditional principle of exercising restraint in assessing the

scope of a criminal statute[4] and on the rule of lenity which construes penal laws

strictly and resolves ambiguities in favor of the defendant. *Id.* The court ruled

that,

> § 1512(c)(2) must be interpreted as limited by subsection (c)(1), and
> thus requires that the defendant have taken some action with respect to
> a document, record, or other object in order to corruptly obstruct,
> impede or influence an official proceeding.

*Id.*

### Defendant's Alleged Conduct Does Not Violate § 1512(c)(2)

Applying that interpretation to the defendant's alleged conduct in *Miller*, the

court ruled that,

> [n]othing in Count Three (or the Indictment more generally) alleges, let
> alone implies, that Miller took some action with respect to a document,
> record, or other object in order to corruptly obstruct, impede or
> influence Congress's certification of the electoral vote.

---

[4] *Exhibit. 1,* at 8.

*Id.* at 29.   Accordingly, the court dismissed the obstruction count because the conduct alleged did not violate the statute.   *Id.*

Here, except for the named defendants, Count Two of the indictment is identical to Count Three in *Miller*.   Although, unlike *Miller,* the instant indictment also alleges depredation of property, i.e. doors and windows, in Count Four, such conduct does not impair the integrity or availability of evidence.   Accordingly, as in *Miller,* nothing in Count Two or the indictment in general alleges or implies that Hughes took some action for the purpose of impairing the integrity or availability of evidence with respect to the certification of the electoral vote.

The *Miller* court specifically rejected the government's argument that the defendant's alleged conduct obstructed Congress's ability to review documents that it was constitutionally and statutorily required to receive and act upon, thereby obstructing the certification of the Electoral College vote.   *Ex 1,* at 29.   The court reasoned that,

> none of those facts are set forth in the indictment, and the Court cannot consider them on this Motion to Dismiss.   *Akinyoyenu*, 199 F. Supp. 3d at 109–10. And in any event, the government does not argue that Miller *himself* took or attempted to take any action with respect to those records or documents.   Absent such an allegation, the Indictment fails to allege a violation of 18 § U.S.C. 1512(c)(2).

*Id.*   Similarly, here, it is defendant's understanding that the government does not contend that Hughes took or attempted to take any action with respect to the

documents Congress was required to receive and act upon.  Accordingly, as in *Miller,* Count Two must be dismissed.

Respectfully submitted,

__/s/_____
Jonathan Zucker, #384629
37 Florida Avenue, NE, Suite 200
Washington, DC  20002
202-624-0784
jonathanzuckerlaw@gmail.com

*Counsel for Defendant*

## CERTIFICATE OF SERVICE

I certify that on this 12th day of March, 2022, I caused the foregoing to be electronically filed with the court using the CM/ECF system that will served the following registered user:

EMILY ALLEN
Assistant United States Attorney
Fourth Street, N.W.
Washington, D.C. 20530
Emily.Allen@usdoj.gov

__/s/_____
Jonathan Zucker

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,

v.

GARRET MILLER,

*Defendant*.

Criminal Action No. 1:21-cr-00119 (CJN)

## <u>MEMORANDUM OPINION</u>

On January 6, 2021, as a joint session of Congress convened in the U.S. Capitol to certify the vote count of the Electoral College, thousands of people, many of whom had marched to the Capitol following a rally at which then-President Donald Trump spoke, gathered outside. ECF No. 1-1; *United States v. Montgomery*, No. 21-cr-46, 2021 WL 6134591, at *2 (D.D.C. 2021). Things soon turned violent. *See* ECF No. 1-1. By approximately 2:00 p.m., rioters had broken through the protective lines of the Capitol Police, assaulting officers and breaking windows in the process. *Id.* The violence escalated, often cheered on by certain members of the mob. *Id.* And the rioters soon stormed through the halls of Congress, forcing members of the House of Representatives, the Senate, and the Vice President to flee. *Id.* "The rampage left multiple people dead, injured more than 140 people, and inflicted millions of dollars in damage to the Capitol." *Trump v. Thompson*, 20 F.4th 10, 15 (D.C. Cir. 2021).

The government alleges that Defendant Garret Miller was an active participant in these events. On May 12, 2021, a grand jury returned a second superseding indictment that charges Miller with twelve different criminal offenses, several of which are felonies. The government asserts that Miller predicted the likelihood of violence on January 6; pushed past officers to gain entrance to the Capitol; posted videos and pictures on social media from inside; and made various

1
EXHIBIT 1

self-incriminating statements in the days thereafter.  *See infra* at 3–4.  The government has also

proffered evidence that Miller made several threats on social media following January 6, including

to Representative Alexandria Ocasio-Cortez and a Capitol Police Officer.  *See id.* at 4–5.

Miller has filed several pretrial motions.  He moved to revoke the detention order that had

been entered by the District Court for the Northern District of Texas.  ECF No. 14.  The Court

denied that request on the ground that no conditions of release could reasonably ensure the safety

of the community were Miller to be released before trial.  *See* Minute Entry of April 1, 2021.

Miller also moved for discovery and for an evidentiary hearing regarding what he claimed was the

government's selective prosecution of him as compared to the protestors in Portland, Oregon, ECF

No. 32, 33.  The Court denied those motions.  ECF No. 67.

Still pending is Miller's Motion to Dismiss Count Three of the Superseding Indictment

("Mot."), ECF No. 34, in which Miller seeks to dismiss one of the twelve counts in the Second

Superseding Indictment.  For the reasons discussed below, the Court agrees with Miller that his

conduct does not fit within the scope of the statute he is charged with violating, 18 U.S.C.

§ 1512(c)(2).

## BACKGROUND

### A.  January 6, 2021[1]

At approximately 1:00 p.m. on January 6, 2021, a joint session of Congress convened in

the U.S. Capitol.  ECF No. 1-1 at 1.  Its purpose was to certify the vote count of the Electoral

College, as required by the Twelfth Amendment and the Electoral Count Act, 3 U.S.C. § 15.  Then-

---

[1] The facts in this subsection are meant for background only.  The Court's analysis of Miller's Motion to Dismiss is limited to the Indictment alone.  *See United States v. Akinyoyenu*, 199 F. Supp. 3d 106, 109–10 (D.D.C. 2016) (citing *United States v. Ballestas*, 795 F.3d 138, 149 (D.C. Cir. 2015)).

EXHIBIT 1

Vice President Michael Pence, as President of the Senate, presided over the joint session.  ECF No. 1-1 at 1.

The proceedings started relatively smoothly.  After about thirty minutes, the Senate returned to its chambers so the two houses could separately consider an objection from the State of Arizona.  *Montgomery*, 2021 WL 6134591, at *2.  During this period, the mob mentioned above—having marched to the Capitol following a rally at which then-President Donald Trump spoke, *id.*—started to form outside, ECF No. 1-1 at 1.

The Capitol is a secure building, guarded at all times by the United States Capitol Police.  *Id.*  But on January 6, 2021, the Capitol Police had taken extra precautions, erecting temporary and permanent barriers around the building's perimeter.  *Id.*  The Capitol Police also closed the entire exterior plaza of the building to the public.  *Id.*

Those extra precautions were not enough.  The mob soon turned violent.  *See id.*  Rioters broke through the protective lines of the Capitol Police, assaulted officers, and shattered windows in the process.  *Id.*  Members of the House of Representatives, the Senate, and the Vice President fled as rioters mobbed the halls.  *Id.*  All the while, looting and destruction continued, *see id.*, producing devastating results, *see Thompson*, 20 F.4th at 15–16.

The government alleges that Miller was part of this violent mob, pushing past officers to gain entrance to the building.  ECF No. 1-1 at 2, 5.  The government alleges that he foresaw the violence coming, as he posted to Facebook four days before that he was "about to drive across the country for this [T]rump shit.  On Monday . . . Some crazy shit going to happen this week.  Dollar might collapse . . . civil war could start . . . not sure what to do in DC."  *Id.* at 2.[2]  It further alleges that Miller posted videos to his Twitter account from the Capitol rotunda, showing rioters waving

---

[2] It is unclear whether the ellipses are Miller's own or added by the government.

flags of support for then-President Trump.  *Id.*  Miller allegedly captioned the video as being "From inside [C]ongress."  *Id.*  And he is claimed to have posted a selfie of himself inside the Capitol. When a commentor wrote "bro you got in?!  Nice!" Miller allegedly replied, "just wanted to incriminate myself a little lol."  *Id.* at 4.

The government contends that Miller made several additional incriminating social-media posts in the days following the attack on January 6.  When individuals on Twitter claimed that those who stormed the Capitol were "paid infiltrators" or "antifa," Miller is alleged to have consistently corrected them:  "Nah we stormed it.  We where [sic] gentle.  We where [sic] unarmed. We knew what had to be done."  *Id.* at 6.  And when others asked him if he was in the building, he allegedly responded, "Yah . . . we charged . . . We where [sic] going in . . . No matter what . . . Decided before the [T]rump speech . . . I charged the back gates myself with an anti[-]masker." *Id.*

The government also alleges that Miller made several threats on social media following January 6.  Regarding Representative Alexandria Ocasio-Cortez, he tweeted, "Assassinate AOC." *Id.* at 8.  And when discussing the shooting of a woman by a Capitol Police Officer during the riot, Miller is alleged to have written, "We going to get a hold [sic] of [the officer] and hug his neck with a nice rope[.]"  *Id.* at 9.  When the person with whom he was chatting responded, "Didn't you say you were a Christian or some lie?," Miller is alleged to have typed, "Justice . . . Not murder . . . Read the commandment . . . there[']s a difference."  *Id.*  He also is alleged to have made several additional comments about "huntin[g]" this police officer.  *See id.*  And he is alleged to have later written in a Facebook chat, "Happy to make death threats so I been just off the rails tonight lol." *Id.*

### B. Miller's Indictment

For purposes of Miller's Motion to Dismiss Count III, the Court must assume as true the allegations contained in the Indictment—but may rely only on those allegations. *United States v. Akinyoyenu*, 199 F. Supp. 3d. 106, 109–10 (D.D.C. 2016) (citing *United States v. Ballestas*, 795 F.3d 138, 149 (D.C. Cir. 2015)). The Second Superseding Indictment, and particularly Count Three, is quite sparse. It provides:

**COUNT THREE**

> On or about January 6, 2021, within the District of Columbia and elsewhere, **GARRET MILLER**, attempted to, and did, corruptly obstruct, influence, and impede an official proceeding, that is, a proceeding before Congress, specifically, Congress's certification of the Electoral College vote as set out in the Twelfth Amendment of the Constitution of the United States and 3 U.S.C. §§ 15–18.

Second Superseding Indictment ("Indictment"), ECF No. 61 at 2–3.[3] The Indictment further specifies that this is an alleged violation of 18 U.S.C. § 1512(c)(2) and 18 U.S.C. § 2, what the government titles "Obstruction of an Official Proceeding and Aiding and Abetting" the same. *Id.* at 3. The Indictment provides no other facts in support of this Count.

### C. Miller's Motion to Dismiss

Miller moves to dismiss only Count Three. *See generally* Mot. The statute he is charged with violating, 18 U.S.C. § 1512(c)(2), provides:

> **(c)** Whoever corruptly—
>
> > **(1)** alters, destroys, mutilates, or conceals a record, document, or other object, or attempts to do so, with intent to impair the object's integrity or availability for use in an official proceeding; or

---

[3] Miller moved to dismiss Count Three of the First Superseding Indictment, ECF No. 30, but the language of Count Three is identical in the Second Superseding Indictment. His original Motion is thus not moot. *See United States v. Goff*, 187 Fed. App'x 486, 491 (6th Cir. 2006).

5

EXHIBIT 1

(**2**) otherwise obstructs, influences, or impedes any official proceeding, or attempts to do so,

shall be fined under this title or imprisoned not more than 20 years, or both.

18 U.S.C. § 1512(c).[4]  Miller presents various objections to Count III, either in his own briefs or by adopting arguments made by other January 6 defendants.

First, Miller claims that Congress's certification of the 2020 presidential election was not an "official proceeding." Mot. at 8–11.  He argues that because the certification was not judicial in nature, it was not a "proceeding" at all.  Miller marshals several definitions of "proceeding" to support this position.  *See id.*

Second, Miller argues that § 1512(c)(2) must be read as a catchall to the narrowly focused subsection preceding it, § 1512(c)(1)—not as an untethered, wholly unrelated crime.  *See* Miller's Second Supplemental Brief ("Sec. Supp."), ECF No. 59 at 3–7.  In Miller's view, since § 1512(c)(1) is narrowly tailored to evidence spoliation, and "specific examples enumerated prior to [a] residual clause are typically read as refining or limiting in some way the broader catch-all term used in the residual clause," *id.* at 4, § 1512(c)(2) must be limited to "conduct [that] undermined the official proceeding's truth-finding function through actions impairing the integrity and availability of evidence," *id.* at 7 (quotations omitted).

Finally, Miller argues that the mens rea requirement of § 1512(c)(2)—that the criminal act be committed "corruptly"—lacks a limiting principle, and is thus unconstitutionally vague as applied to him. Sec. Supp. at 7–16.  "Corruptly," he notes, is not defined in the statute, and relying

---

[4] Count Three also charges a violation of 18 U.S.C. § 2.  That section states that anyone who "commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal."  18 U.S.C. § 2(a).  In the context of Count III, a violation of § 2 is thus dependent on some violation of § 1512(c)(2)—the only offense against the United States charged in Count III.

EXHIBIT 1

on *United States v. Pointdexter*, 951 F.2d 369 (D.C. Cir. 1991), he argues that it is unconstitutionally vague here.  Sec. Supp. at 9–14.

The government contends that Miller's alleged conduct fits comfortably within § 1512(c)(2).  Relying on the statute's definition of "official proceeding" as including "a proceeding before Congress," 18 U.S.C. § 1515(a)(1)(B), the government argues that the certification of the electoral vote was plainly a proceeding before Congress.  *See generally* Opp. to Def.'s Mot. to Dismiss ("Resp."), ECF No. 35.  As to the scope of § 1512(c)(2), the government argues that the statute "comprehensively prohibit[s] conduct that intentionally and wrongfully obstructs official proceedings," and does not require any connection to evidence or documents. Gov't Resp. to Defs.' Joint Supp. Br. ("*Montgomery* Br."), ECF No. 63-1 at 6.[5]  And with respect to Miller's vagueness argument, the government contends that, as used here, "corruptly" is not unconstitutionally vague—and indeed that the Court of Appeals and Supreme Court have rejected vagueness challenges to convictions under statutes requiring that a defendant acted "corruptly." *Id.* at 17–20.

For each contention, Miller notes that the Court is under an obligation to exercise restraint in construing criminal laws and to apply the rule of lenity should genuine ambiguity persist.  Mot. at 7 & n.1.  The government does not challenge either of these interpretive principles.  *See generally Montgomery* Br.

---

[5] In response to Miller's Second Supplemental Brief, the government lodged in this case the brief it filed in *United States v. Montgomery*, No. 21-cr-46.

7

EXHIBIT 1

**LEGAL STANDARDS**

**A.  Motions to dismiss generally**

Before trial, a criminal defendant may move to dismiss a charge based on a "defect in the indictment."  Fed R. Crim. P. 12(b)(3)(B).  "The operative question is whether the allegations in the indictment, if proven, permit a jury to conclude that the defendant committed the criminal offense as charged."  *Akinyoyenu*, 199 F. Supp. 3d at 109.  The Court thus bases its analysis only on the language charged in the Indictment and the language of the statute alleged to have been violated.  *See id.* at 109–10 (collecting citations).

**B.  The Court must exercise restraint when assessing the reach of criminal statutes**

Because Miller challenges the scope of a federal criminal statute and its application to his alleged conduct, additional interpretive rules apply.  First, federal courts have "traditionally exercised restraint in assessing the reach of a federal criminal statute."  *United States v. Aguilar*, 515 U.S. 593, 600 (1995).  The Supreme Court has urged this restraint "both out of deference to the prerogatives of Congress and out of concern that 'a fair warning should be given to the world in language that the common world will understand, of what the law intends to do if a certain line is passed.' "  *Id.* at 600 (citations omitted); *cf. Sessions v. Dimaya*, 138 S. Ct. 1204, 1223–28 (2018) (Gorsuch, J., concurring in part and concurring in judgment).  This "prudent rule of construction" continues with force today.  *Dowling v. United States*, 473 U.S. 207, 214 (1985); *see Marinello v. United States*, 138 S. Ct. 1101, 1108 (2018) (endorsing the rule).

Running parallel to this principle is the rule of lenity.  "[T]he rule of lenity is venerable," *United States v. Nasir*, 17 F.4th 459, 472 (3d Cir. 2021) (en banc) (Bibas, J., concurring), having arisen to mitigate draconian sentences in England and having been firmly established in English law by the time of Blackstone, *id.* at 473.  "[I]t took root in our law soon thereafter."  *Id.*

8
EXHIBIT 1

"Under the rule of lenity, courts construe penal laws strictly and resolve ambiguities in favor of the defendant," *id.*, so long as doing so would not "conflict with the implied or expressed intent of Congress," *Liparota v. United States*, 471 U.S. 419, 427 (1985).  Under current doctrine, the rule of lenity applies to instances of "grievous" ambiguity, *see Shular v. United States*, 140 S. Ct. 779, 788 (2020) (Kavanaugh, J., concurring) (collecting citations), a construction that is arguably in tension with the rule's historical origins, *see* 1 William Blackstone, *Commentaries* *88 ("Penal statutes must be construed strictly.").  *See also Wooden v. United States*, ___ U.S. ___, ___ (2022) (Gorsuch, J., concurring in judgment) (slip op. at 9–12); *but see id.* (Kavanaugh, J., concurring) (slip op. at 1–4).

## I. CONGRESSIONAL CERTIFICATION OF ELECTORAL COLLEGE RESULTS IS AN "OFFICIAL PROCEEDING"

Miller's first argument is that the Congressional certification of the Electoral College was not an "official proceeding."  Mot. at 8–11.  But this argument essentially ignores that, as used in § 1512, "official proceeding" is a defined term, and its definition covers the Congressional certification of Electoral College results.

18 U.S.C. § 1515(a)(1) provides that, "[a]s used in section[] 1512 . . . *the term 'official proceeding' means . . . a proceeding before the Congress*."  18 U.S.C. § 1515(a)(1)(B) (emphasis added).  A "proceeding" is "a particular thing done: affair, transaction, negotiation," as in "an illegal proceeding" or "business proceedings."  *Proceeding*, def. f, *Merriam-Webster's Unabridged Dictionary* (2021).  The certification of the Electoral College is, of course, "a particular thing done" before Congress.

Miller argues that the "legal," as opposed to "lay," understanding of "proceeding" should control here.  Mot. at 9; *see also United States v. Ermoian*, 752 F.3d 1165, 1170 (9th Cir. 2013).  But Black's Law Dictionary—the leading authority on "legal" uses of words—defines a

"proceeding" as "[t]he business conducted by a court or other official body; a hearing." *Proceeding*, def. 4, Black's Law Dictionary (11th ed. 2019). The certification of the Electoral College results by Congress is "business conducted by a[n] . . . official body." *Id.* Indeed, it is business required by both the Twelfth Amendment and the Electoral Count Act. *See* U.S. Const. Amend. XII; 3 U.S.C. § 15.

To be sure, several definitions of the word "proceeding"—whether "lay" or "legal" definitions—focus on judicial proceedings. *See, e.g.*, *Proceeding*, def. 1, Black's Law Dictionary (11th ed. 2019) ("The regular and orderly progression of a lawsuit, including all acts and events between the time of commencement and the entry of judgment"). But context matters, and it makes little if any sense, in the context here, to read "a proceeding before Congress" as invoking only the judicial sense of the word "proceeding." After all, the only proceedings of even a quasi-judicial nature before Congress are impeachment proceedings, and Miller has offered no reason to think Congress intended such a narrow definition here.

\*     \*     \*

Miller's Indictment thus properly alleges an involvement with an official proceeding— "that is, a proceeding before Congress, specifically, Congress's certification of the Electoral College vote as set out in the Twelfth Amendment of the Constitution of the United States and 3 U.S.C. §§ 15–18." Indictment at 2–3. On that ground, at least, his Motion to Dismiss fails.

## II. MILLER'S ALLEGED CONDUCT DOES NOT FIT WITHIN THE SCOPE OF SECTION 1512(C)(2)

Miller's second challenge is broader: he argues that § 1512(c)(2) does not make criminal his alleged actions on January 6. In order to assess the merits of this challenge, the Court must determine what conduct § 1512(c)(2) prohibits and whether Miller's alleged actions fall within that prohibition. Applying the traditional tools of statutory interpretation—text, structure, and the

EXHIBIT 1

development of the statute over time—the Court concludes that three readings of the statute are possible, and two are plausible.  This is therefore a circumstance in which the Court must "exercise[ ] restraint in assessing the reach of a federal criminal statute," *Aguilar*, 515 U.S. at 600, and "resolve ambiguities in favor of the defendant," *Nasir*, 17 F.4th at 473 (Bibas, J., concurring) (citing *Liparota*, 471 U.S. at 427).

### A.  The text of § 1512(c) supports three possible readings of the statute

The Court begins, as it must, with the text.  Recall what § 1512(c) proscribes:

> **(c)**  Whoever corruptly—
>
> > **(1)** alters, destroys, mutilates, or conceals a record, document, or other object, or attempts to do so, with intent to impair the object's integrity or availability for use in an official proceeding; or
> >
> > **(2)** *otherwise* obstructs, influences, or impedes any official proceeding, or attempts to do so,
>
> shall be fined under this title or imprisoned not more than 20 years, or both.

18 U.S.C. § 1512(c) (emphasis added).  Miller is charged with violating only subsection (2).

Reading § 1512(c)(2) alone is linguistically awkward.  That is because of the adverbial use of the word "otherwise," such that § 1512(c)(2), on its own, makes criminal "whoever corruptly . . . otherwise obstructs, influences, or impedes any official proceeding, or attempts to do so."  The parties are therefore in agreement that the meaning of "otherwise" is critical to determining what § 1512(c)(2) covers.  They differ, however, over what that meaning is, and whether or how the word "otherwise" ties § 1512(c)(2) to the prior subsection—§ 1512(c)(1).

*Otherwise as a clean break between subsections*.  When § 1512(c) became law, "otherwise" had three different definitions that are plausible in this context:  "in a different way or manner: differently"; "in different circumstances: under other conditions"; and "in other respects." *Otherwise*, *Webster's Third New Int'l Dictionary of the English Language Unabridged* (2002).

Relying on the first definition—"in a different way or manner"—and the breadth of the terms in § 1512(c)(2), the government suggests that "otherwise" essentially serves as a clean break between subsections (c)(1) and (2), and thus the only question is whether Miller "corruptly . . . obstruct[ed], influence[d], or impede[d] any official proceeding, or attempt[ed] to do so."  Under this reading, there would be no relationship between subsections (c)(1) and (c)(2) at all.

There are a number of problems with this interpretation.  *First*, it ignores that "otherwise" has several different (though related) definitions, each of which implies a relationship to something else—here, subsection (c)(1).

*Second*, and more important, this interpretation does not give meaning to the word "otherwise."  When possible, of course, the Court must give effect to every word in a statute.  *Setser v. United States*, 566 U.S. 231, 239 (2012).  But if § 1512(c)(2) is read as wholly untethered to § 1512(c)(1), then "otherwise" would be pure surplusage.  In other words, under this reading, subsection (c)(2) would have the same scope and effect as if Congress had instead omitted the word "otherwise."

*Third*, reading "otherwise" in this way is inconsistent with *Begay v. United States*, 553 U.S. 137 (2008), *abrogated on other grounds by Johnson v. United States*, 576 U.S. 591 (2015).  There, the Supreme Court considered whether drunk driving was a "violent felony" under the Armed Career Criminal Act.  The ACCA defined a "violent felony" as "any crime punishable by imprisonment for a term exceeding one year" that "is burglary, arson, or extortion, involves use of explosives, or *otherwise* involves conduct that presents a risk of physical injury to another." *Begay*, 553 U.S. at 139–40 (quoting 18 U.S.C. § 924(e)(2)(B)(ii) (2000)) (emphasis added).  Crucial to the Court's analysis was thus what "otherwise" meant.

EXHIBIT 1

Both the five-Justice majority and Justice Scalia concluded that the ACCA's use of the word "otherwise" in some way tethered the text preceding the word to the text following it; the majority and Justice Scalia differed only in *how* it did so.  The majority opinion concluded that the text preceding "otherwise" influenced the meaning of the text that followed:  it "limit[ed] the scope of the clause to crimes that are *similar to the examples themselves*."  *Begay*, 553 U.S. at 143 (emphasis added).  The Court thus held that "driving under the influence" fell outside of the ACCA's "violent felony" definition because it was not like burglary, arson, or extortion.  *Id.* at 142.

As for Justice Scalia, he agreed with the majority that "otherwise" tethered the text preceding it to the text following, but he disagreed regarding how they related.  In Justice Scalia's view, "by using the word 'otherwise' the writer draws a substantive connection between two sets only on one specific dimension—*i.e.*, whatever *follows* 'otherwise.'"  *Id.* at 151 (Scalia, J., concurring in judgment) (emphasis added).  Thus, in Justice Scalia's view, the text before "otherwise" did not limit the text that follows it.[6]

Justice Alito dissented.  In the dissent's view, the "offenses falling within the residual clause must be similar to the named offenses in one respect only:  They must 'otherwise'—which is to say, 'in a different manner'—'involv[e] conduct that presents a serious potential risk of physical injury to another.'"  *Id.* at 159 (Alito, J., dissenting) (citations omitted) (modification in original).  As a result, Justice Alito concluded, the only question was whether drunk driving "involv[es] conduct that presents a risk of physical injury to another"—and, Justice Alito

---

[6] Justice Scalia had previously advanced this position in his dissent in an earlier ACCA case.  *See James v. United States*, 550 U.S. 192, 218 (2007) (Scalia, J., dissenting).

concluded, it does.  *Id.*  This position, of course, is very similar to the interpretation suggested by the government here.  *See Montgomery* Br. at 7–8.  But it garnered only three votes.

The Court recognizes that certain courts of appeals have adopted this clean-break reading of "otherwise" in § 1512(c)(2), but the Court is not persuaded that those decisions are correct. Take *United States v. Petruk*, 781 F.3d 438 (8th Cir. 2015), for example.  That decision's textual analysis is curt, and only one paragraph discusses the statutory language:

> While we acknowledge that § 1512(c)(1) is limited to obstruction relating to "a record, document, or other object," § 1512(c)(2) is not so limited. Section 1512(c)(2) gives defendants fair warning in plain language that a crime will occur in a different ("otherwise") manner compared to § 1512(c)(1) if the defendant "obstructs, influences, or impedes any official proceeding" without regard to whether the action relates to documents or records.  *See* Webster's New World College Dictionary 1021 (4th ed. 2007) (defining "otherwise" as "in another manner; differently").  Thus, § 1512(c)(2) "operates as a catch-all to cover otherwise obstructive behavior that might not constitute a more specific offense like document destruction, which is listed in (c)(1)."  *United States v. Volpendesto*, 746 F.3d 273, 286 (7th Cir. 2014) (citation omitted) (internal quotation marks omitted); *see also Aguilar*, 515 U.S. at 598 (interpreting similar language in 18 U.S.C. § 1503(a) as a "catchall" omnibus clause that is "far more general in scope than the earlier clauses of the statute").

*Id.* at 446–47.

The decision in *Petruk* does not mention, let alone discuss, the Supreme Court's decision in *Begay*.  Moreover, it relies on an incorrect reading of the Court's decision in *Aguilar*.  In particular, as reflected in the quotation above, *Petruk* described *Aguilar* as having "interpret[ed]" a clause in 18 U.S.C. § 1503 as a " 'catchall' omnibus clause that 'is far more general in scope than the earlier clauses of the statute.' "  *Id.* (quoting *Aguilar*, 515 U.S. at 598).  But that language from *Aguilar* came at the *beginning* of the Supreme Court's opinion, when the Court was merely explaining how "[t]he statute is structured."  *Aguilar*, 515 U.S. at 598.  The actual opinion in *Aguilar* went on to *reject* such a broad reading of the "omnibus clause," instead adopting

"decisions of Courts of Appeals [that] have . . . place[d] metes and bounds on the very broad language of the catchall provision." *Id.* at 599–600. And *Aguilar* explained the Court's traditional restraint in assessing the reach of criminal statutes as support for this holding. *See id.* at 600.[7]

*Subsection (c)(1) provides examples of conduct that violates subsection (c)(2).* The government also presents an alternative reading of the statute: that subsection (c)(1) contains specific examples of conduct that is unlawful under subsection (c)(2). On this interpretation, the word "otherwise" in § 1512(c)(2) does tether the two subsections together, with the text preceding the word—subsection (c)(1)—providing examples that fit within (c)(2)'s broader scope. Under this reading, a common element in, or link between, the subsections is that the unlawful conduct must relate to an "official proceeding." *See Montgomery*, 2021 WL 6134591 at *12.

This interpretation solves several of the problems posed by the interpretation discussed above. It acknowledges that "[b]y using the word 'otherwise,' Congress indicated a substantive connection between" the text preceding and the text following the word. *United States v. Begay*, 470 F.3d 964, 980 (McConnell, J., dissenting in part), *overruled by Begay*, 553 U.S at 148. And it is consistent with Justice Scalia's concurrence in *Begay*.

But this interpretation has other problems. If Congress intended for the common, linking element in both subsections to be the pendency of an "official proceeding," then the use of "otherwise" in § 1512(c)(2) would be superfluous. After all, both subsections include the term

---

[7] The Seventh Circuit's decision in *United States v. Burge*, 711 F.3d 803 (7th Cir. 2013), similarly misconstrued *Aguilar*. *See id.* at 809 (relying on *Aguilar* as having "interpret[ed] similar language in 18 U.S.C. § 1503 as an 'Omnibus Clause . . . prohibiting persons from endeavoring to influence, obstruct, or impede the due administration of justice' and concluding that the language is 'general in scope.'") And, in any event, the scope of § 1512(c)(2) was not before the Seventh Circuit in *Burge*; the question there was whether an official proceeding needed to be *pending* for a defendant to violate the statute. *Id.* The Seventh Circuit later relied on *Burge* in *United States v. Volpendesto*, 746 F.3d 273, 286 (7th Cir. 2014)—which did not even involve a prosecution under § 1503, let alone § 1512(c)(2).

"official proceeding," suggesting that the common link should be something other than the pendency of an official proceeding; otherwise there would be no reason to repeat the term in both subsections.

Moreover, while this approach echoes Justice Scalia's concurrence in *Begay*, there are important differences between § 1512(c) and the ACCA. With respect to the ACCA, "burglary, arson, and extortion"—the specific crimes listed before the word "otherwise"—are paradigmatic examples of crimes that "involve[ ] conduct that presents a risk of physical injury to another." There is thus a relative parity between the two sides of "otherwise" in the ACCA that makes Justice Scalia's view potentially compelling. But not so with § 1512(c)(2). As the government argues, and other courts have recognized, *see, e.g.*, *Montgomery*, 2021 WL 6134591, at *10, "obstruct," "influence," and "impede," are quite broad terms. In contrast, "alter[ing], destroy[ing], mutilat[ing], or conceal[ing]" a record or document is a relatively narrow and discrete prohibition; that is, those are very limited ways in which to obstruct, influence or impede an official proceeding. Without some limitation, the text following "otherwise" is extraordinarily broad in relation to the text preceding it.

The structure of § 1512(c) cuts against this reading, as well. To say that the text of § 1512(c)(1) provides merely *examples* of crimes that fit within § 1512(c)(2)'s scope is to say that the principal (indeed, only) criminal offense in subsection (c) is listed in its second subsection. That turns expectation on its head and is, at the very least, not how a reasonable reader would expect a statute to be organized—a flaw when talking about any statute, but especially a criminal one. *Cf. Dimaya*, 138 S. Ct. at 1223–28 (Gorsuch, J., concurring in part and concurring in judgment).

EXHIBIT 1

*Subsection (c)(2) is a residual clause for subsection (c)(1).*   A third interpretation of the statute—implied, at least, by Miller's arguments—is that subsection (c)(2) operates as a residual clause or catchall for the prohibition contained in subsection (c)(1).   Under this reading, the word "otherwise" links the two subsections, but the link or commonality is found in the conduct prescribed by subsection (c)(1).

This interpretation is consistent with *Begay*.   In particular, the *Begay* majority opinion rejected the government's argument "that the word 'otherwise' is *sufficient* to demonstrate that the examples [preceding 'otherwise'] do not limit the scope of the clause [following 'otherwise']." *Begay*, 553 U.S. at 144 (emphasis in original); *contra Montgomery* Br. at 8 ("Section 1512(c)(2) criminalizes the same *result* prohibited by Section 1512(c)(1)—obstruction of an official proceeding—when the result is accomplished by a different *means*, *i.e.*, by conduct other than destruction of a document, record, or other object.").   To be sure, *Begay* acknowledged that "otherwise" could sometimes have that meaning, but it made clear that it did not *always* have such a limited role.   As the Court put it, "the word 'otherwise' *can* (we do not say *must*, cf. *post*, at [150–51] (Scalia, J., concurring in judgment)) refer to a crime that is similar to the listed examples in some respects but different in others."   *Begay*, 553 U.S. at 144.

Moreover, the Court *held* that "the provision's listed examples"—that is, the text before "otherwise"—". . . indicate[ ] that the statute covers only *similar* crimes, rather than *every* crime that 'presents a serious potential risk of physical injury to another.' "   *Id.* at 142 (quoting 18 U.S.C. § 924(e)(2)(B)(ii)) (emphasis in original).   Justice Scalia himself understood that to be the holding, noting that the majority "read[s] the residual clause to mean that the unenumerated offenses must be similar to the enumerated offenses not only in the degree of risk they pose, but also 'in kind,'

despite the fact that 'otherwise' means that the *common* element of risk must be presented 'in a *different* way or manner.'" *Id.* at 151 (Scalia, J., concurring in judgment) (emphasis in original).[8]

Under this interpretation, subsection (c)(2) operates to ensure that by delineating only certain specific unlawful acts in subsection (c)(1)—"alter[ation], destr[uction], mutilat[ion], or conceal[ment]"—Congress was not underinclusive.  Compare, for example, § 1519.  That statute targets anyone who "alters, destroys, mutilates, conceals, *covers up, falsifies, or makes a false entry in* any record, document, or tangible object" for certain purposes in the context of department or agency investigations.  18 U.S.C. § 1519 (emphasis added).  The highlighted acts are additional ways in which an individual can corruptly act on a "record, document, or tangible object" that are not covered by subsection (c)(1) but would be covered, on this reading, by subsection (c)(2).

To be sure, while the ACCA and § 1512(c)(2) both use the word "otherwise," there are key differences between those statutes.  Perhaps most importantly, the ACCA has no line break or semicolon before its use of "otherwise."  The government therefore argues that § 1512(c)(2) is more like the statute at issue in *Loughrin v. United States*, 573 U.S. 351 (2014), in which the Supreme Court pointed to "two clauses hav[ing] separate numbers, line breaks before, between, and after them, and equivalent indentation" as "placing the clauses visually on an equal footing and indicating that they have separate meanings," *id.* at 359; *Montgomery* Br. at 36.

---

[8] Another court has concluded that "*Begay*'s discussion of the word 'otherwise' is remarkably agnostic," and that the Supreme Court "placed little or no weight on the word 'otherwise' in resolving the case."  *Montgomery*, 2021 WL 6134591 at *11.  The Court does not read the *Begay* decision as so limited.  That particular sentence is a response to Justice Scalia's view (rejected by the majority) regarding the use of "otherwise."  As noted above the line, Justice Scalia recognized that the majority had "read[ ] the residual clause to mean that the unenumerated offenses must be similar to the enumerated offenses not only in the degree of risk they pose, but also 'in kind.'" *Begay*, 553 U.S. at 151 (Scalia, J., concurring in judgment).

*Loughrin* dealt with a challenge to a conviction under the federal bank-fraud statute, 18 U.S.C. § 1344, which provides:

> Whoever knowingly executes, or attempts to execute, a scheme or artifice—
>
> > (1) to defraud a financial institution; or
> >
> > (2) to obtain any of the moneys, funds, credits, assets, securities, or other property owned by, or under the custody or control of, a financial institution, by means of false or fraudulent pretenses, representations, or promises;
>
> shall be fined not more than $1,000,000 or imprisoned not more than 30 years, or both.

18 U.S.C. § 1344.  A jury convicted Loughrin of violating § 1344(2) for cashing false checks at a Target, but it did so without finding that he acted with "intent to defraud a financial institution"— the language of § 1344(1).  *See Loughrin*, 573 U.S. at 354–55.  The Court held that such proof was not required for a conviction under § 1344(2).  *See id.* at 355–58.

The statute in *Loughrin* is different from § 1512(c) in important ways.  Most obviously, subsection (2) of the bank-fraud statute does not include the adverb "otherwise," and thus the Court did not even address the primary interpretive question here.  One might even conclude that the fact that Congress did *not* include the word "otherwise" in § 1344(2) suggests that it was aware of how to write broad prohibitions untethered to the text before it.

But the statutes are also similar.  After all, both have separate numbering and line breaks, and as *Loughrin* makes clear, such choices matter.  And when writing § 1512(c), Congress did opt for this drafting technique.

*     *     *

In sum, looking just to the text of 18 U.S.C. § 1512(c), there are three possible, and two quite plausible, interpretations.  It is possible that subsections (c)(1) and (c)(2) are not related at

19<br>EXHIBIT 1

all (though this is not a very plausible interpretation).  Subsection (c)(1) may contain just examples of the much broader prohibition contained in subsection (c)(2).  Or subsection (c)(2) may be limited by subsection (c)(1).  Based solely on the text of § 1512(c), the third option seems to present the fewest interpretive problems.  But it is not abundantly clear that that interpretation is the correct one.

While the text is this Court's lodestar, however, it is not the only factor it must consider.  "In expounding a statute, we must not be guided by a single sentence or member of a sentence, but look to the provisions of the whole law, and to its object and policy."  *U.S. Nat'l Bank of Or. v. Indep. Ins. Agents of Am., Inc.*, 508 U.S. 439, 455 (1993) (quoting *United States v. Heirs of Boisdore*, 8 How. 113, 122 (1850)).  The Court thus turns next to structure.

### B.  The statutory context suggests that subsection (c)(2) has a narrow scope

The structure and scope of § 1512 also suggest that subsection (c)(2) has a narrow focus. In particular, the other subsections of the statute criminalize fairly discrete conduct in narrow contexts.[9]  As examples, subsection (a) criminalizes, among other things, killing another person to prevent the attendance of a person at an official proceeding, 18 U.S.C. § 1512(a)(1)(A), or using physical force (or a threat of it) against a person with the intent to cause someone to withhold testimony from an official proceeding, *id.* § 1512(a)(2)(B)(i).  Subsection (b), in turn, focuses on verbal conduct, such as knowingly using threats with intent to influence, delay, or prevent some testimony at an official proceeding.  *Id.* § 1512(b)(1).  And subsection (d) criminalizes the intentional harassment of a person and thereby hindering, delaying, preventing, or dissuading any person from attending or testifying in an official proceeding.  *Id.* § 1512(d)(1).

---

[9] The title of the section is "Tampering with a witness, victim, or an informant."  And while that might not describe subsection (c), it also captures the narrow, evidentiary focus of the rest of the statute.

Subsection (c)(1) continues the statute's focus on specific and particularized actions, albeit in a slightly different manner.  Instead of making unlawful an individual's action with respect to *another* person to achieve some illicit end—as subsections (a), (b), and (d) do—subsection (c)(1) prohibits an individual from taking certain actions *directly*.  It prohibits "alter[ing], destroy[ing], mutilat[ing], or conceal[ing] a record, document, or other object, or attempt[ing] to do so, with intent to impair the object's integrity or availability for use in an official proceeding."  *Id.* § 1512(c)(1).  Unlike the other subsections of § 1512, it does not require action directed at another person.  But like the other subsections of § 1512, it homes in on a narrow, focused range of conduct.

If, however, the scope of subsection (c)(2) is not limited by subsection (c)(1)—if "otherwise" either signals a clean break or means subsection (c)(1) is only an example fitting within (c)(2)'s scope—it would introduce something of an internal inconsistency:  subsection 1512(c)(2) would be the only provision in § 1512 not to have a narrow focus.  Indeed, the government has relied on the breadth of (c)(2)'s terms to form the basis of its argument.  And this inconsistency would come in the oddest of places:  in a subsection of a subsection nestled in the middle of the statute.  At a minimum, a reader would not expect to find in a statute that is otherwise narrowly (and consistently) tailored a criminal prohibition of exceptionally broad scope, especially in that location.  Congress does not hide elephants in mouseholes, *see Whitman v. Am. Trucking Ass'n, Inc.*, 531 U.S. 457, 468 (2001), but this seems precisely that.

A different reading would also create substantial superfluity problems.  After all, if subsection (c)(2) is not limited by subsection (c)(1), then the majority of § 1512 would be unnecessary.  At a minimum, conduct made unlawful by at least eleven subsections— §§ 1512(a)(1)(A),      1512(a)(1)(B),      1512(a)(2)(A),      1512(a)(2)(B)(i),      1512(a)(2)(B)(iii),

1512(a)(2)(B)(iv), 1512(b)(1), 1512(b)(2)(A), 1512(b)(2)(C), 1512(b)(2)(D), and 1512(d)(1)—

would also run afoul of § 1512(c)(2).  To be sure, superfluity is not typically, by itself, sufficient

to require a particular statutory interpretation.  *See Hubbard v. United States*, 514 U.S. 695, 714

n.14 (1995).  But here, such substantial overlap within the same section suggests that Congress did

not mean § 1512(c)(2) to have so broad a scope.

Another court has sought to allay this overlap concern by pointing to the language Congress

could have used:

> [I]t would have been easy for Congress to craft language to achieve the goal
> that Defendants now hypothesize.  Congress, for example, could have
> substituted Section 1512(c)(2) with the following: "engages in conduct that
> otherwise impairs the integrity or availability of evidence or testimony for
> use in an official proceeding."  The fact that Congress, instead, enacted
> language that more generally—and without the limitations that Defendants
> now ask the Court to adopt—criminalized efforts corruptly to obstruct
> official proceedings speaks volume.

*Montgomery*, 2021 WL 6134591, at *12.  That is certainly true, and in fact is why the Court does

not believe that there is a single obvious interpretation of the statute.  But it is also the case that

reading § 1512(c)(1) as limiting the scope of § 1512(c)(2) avoids many of these structural or

contextual issues altogether.  Under such a reading, § 1512(c)(2) operates as a catchall to the

narrow prohibition Congress created in § 1512(c)(1)—not as a duplicate to nearly all of § 1512.[10]

---

[10] Perhaps another way of reading § 1512(c)(2) without creating substantial superfluity problems
would be as creating "direct" liability for the other types of conduct covered by § 1512—that is,
that it makes criminal an individual doing directly those things for which the rest of § 1512 requires
action directed at another person.  Neither party presses this argument (or anything like it), so the
Court does not address it further.  But the Court does note that, while this reading might eliminate
some superfluity, placing this kind of catchall in a subsection of a subsection in the middle-back
of § 1512 is still unintuitive.

### C. The historical development of § 1512 suggests that § 1512(c)(2) operates as a catchall to § 1512(c)(1)

Prior to the enactment of subsection 1512(c) in 2002, § 1512 made criminal only actions directed at other persons.  For example, at that time subsection (b)(2) provided:

> **(b)**  Whoever knowingly uses intimidation or physical force, threatens, or corruptly persuades *another person*, or attempts to do so, or engages in misleading conduct toward another person, with intent to—
>
> > **(2)** cause or induce any person to—
> >
> > > **(A)** withhold testimony, or withhold a record, document, or other object, from an official proceeding;
> > >
> > > **(B)** alter, destroy, mutilate, or conceal an object with intent to impair the object's integrity or availability for use in an official proceeding;
> > >
> > > **(C)** evade legal process summoning that person to appear as a witness, or to produce a record, document, or other object, in an official proceeding; or
> > >
> > > **(D)** be absent from an official proceeding to which such person has been summoned by legal process; . . .

shall be fined under this title or imprisoned not more than ten years, or both.

18 U.S.C. §§ 1512(b)(1) (1996).  Other subsections similarly prohibited conduct directed at causing or influencing "another person" to take improper action.  *Id.* §§ 1512(a)(1)(A)–(C), 1512(c)(1)–(4).  This created a gap in the statutory scheme:  § 1512 made it unlawful to cause "another person" to take certain steps—such as to "alter, destroy, mutilate, or conceal an object"— but did not make it unlawful for a person to take such action directly.

Section 1512(c) filled that gap, and took much of its language from § 1512(b).  Compare the two provisions:

**(b)**  Whoever knowingly uses intimidation or physical force, threatens, or corruptly persuades another person, or attempts to

**(c)**  Whoever corruptly—

> **(1)** *alters, destroys, mutilates, or conceals a record, document, or other object, or*

do so, or engages in misleading conduct toward another person, with intent to—

(**2**) cause of induce any person to—

    (**A**) withhold testimony, or withhold a record, document, or other object, from an official proceeding;

    (**B**) *alter, destroy, mutilate, or conceal an object with intent to impair the object's integrity or availability for use in an official proceeding*;

    (**C**) evade legal process summoning that person to appear as a witness, or to produce a record, document, or other object, in an official proceeding; or

    (**D**) be absent from an official proceeding to which such person has been summoned by legal process; . . .

shall be fined under this title or imprisoned not more than ten years, or both.

*attempts to do so, with the intent to impair the object's integrity or availability for use in an official proceeding*; or

(**2**) otherwise obstructs, influences, or impedes any official proceeding, or attempts to do so,

shall be fined under this title or imprisoned not more than 20 years, or both.

18 U.S.C. § 1512(b)(2) (1996) (left) (emphasis added); 18 U.S.C. § 1512(c) (2002) (right) (emphasis added).  Just three months later, the same Congress added § 1512(a)(2)(B), which again drew on § 1512(b):

(**b**) Whoever knowingly uses intimidation or physical force, threatens, or corruptly persuades another person, or attempts to do so, or engages in misleading conduct toward another person, with intent to—

(**2**) cause or induce any person to—

    (**A**) withhold testimony, or withhold a record, document, or other object, from an official proceeding;

(**a**)

    . . .

(**2**) Whoever uses physical force or the threat of physical force against any person, or attempts to do so, with intent to—

    (**B**) cause or induce any person to—

        (**i**) withhold testimony, or withhold a record, document, or other

EXHIBIT 1

**(B)** *alter, destroy, mutilate, or conceal an object with intent to impair the object's integrity or availability for use in an official proceeding*;

**(C)** evade legal process summoning that person to appear as a witness, or to produce a record, document, or other object, in an official proceeding; or

**(D)** be absent from an official proceeding to which such person has been summoned by legal process; . . .

shall be fined under this title or imprisoned not more than ten years, or both.

object, from an official proceeding;

**(ii)** *alter, destroy, mutilate, or conceal an object with intent to impair the object's integrity or availability for use in an official proceeding*;

**(iii)** evade legal process summoning that person to appear as a witness, or to produce a record, document, or other object, in an official proceeding; or

**(iv)** be absent from an official proceeding to which such person has been summoned by legal process; . . .

shall be punished as provided in paragraph (3).

18 U.S.C. § 1512(b)(2) (1996) (left) (emphasis added); 18 U.S.C. § 1512(a)(2)(B) (2002) (right) (emphasis added).

A fair inference is that, by adding subsection (c) to fill the gap in § 1512, and by drawing heavily from a single provision out of four already included in subsection (b), Congress intended subsection (c) to have a narrow, limited focus—just like subsection (b)(2)(B). The only difference is that subsection (c) does not include the requirement of acting through another person. That the same Congress further adopted *all* of § 1512(b)(2) in § 1512(a)(2)(B)—rather than just one sub-subsection of § 1512(b)(2)—further suggests that its enactment of §1512(c)(1) was intended to be narrow. Perhaps just as important, if subsection 1512(c)(2) is as broad as the government contends here, there would have been no need for the very same Congress to add § 1512(a)(2)(B) just three months later.

**D.  If anything, the legislative history supports a narrow reading of subsection (c)(2)**

"Legislative history, for those who take it into account, is meant to clear up ambiguity, not create it." *Milner v. Dep't of Navy*, 562 U.S. 562, 574 (2011).  The government relies on legislative history, but it does not support the government's position.

Section 1512(c) was enacted as part of the Sarbanes-Oxley Act of 2002, 116 Stat. 745. "The Sarbanes-Oxley Act, all agree, was prompted by the exposure of Enron's massive accounting fraud and revelation that the company's outside auditor, Arthur Andersen LLP, had systematically destroyed potentially incriminating documents."  *Yates v. United States*, 574 U.S. 528, 535–36 (2015) (plurality opinion).   As discussed above, while § 1512(b) "made it an offense to 'intimidat[e], threate[n], or corruptly presuad[e] *another person*' to shred documents," the statute did not prohibit individuals from shredding documents themselves.  *Id.* at 536 (emphasis added). The Senate Report for the Act identified this statutory loophole:

> Indeed, even in the current Andersen case, prosecutors have been forced to use the "witness tampering" statute, 18 U.S.C. § 1512, and to proceed under the legal fiction that the defendants are being prosecuted for telling other people to shred documents, not simply for destroying evidence themselves. Although prosecutors have been able to bring charges thus far in the case, in a case with a single person doing the shredding, this legal hurdle might present an insurmountable bar to a successful prosecution.

S. Rep. No. 107–146, p. 7 (2002).

As the plurality opinion in *Yates* explains, 18 U.S.C. § 1519 was originally introduced to plug this gap, *Yates*, 574 U.S. at 535–36, and § 1512(c) was added later, *id.* at 542.  In particular, Senator Lott introduced § 1512(c) on July 10, 2002.  *See Montgomery*, 2021 WL 6134591, at *15. He stated that the amendment's "purpose" was "[t]o deter fraud and abuse by corporate executives"—in line with the Enron concern.  148 Cong. Rec. S6542 (daily ed. July 10, 2002).  He later stated that the new subsection "*would enact stronger laws against document shredding*. Current law prohibits obstruction of justice by a defendant acting alone, but only if a proceeding

EXHIBIT 1

is pending and a subpoena has been issued for the evidence that has been destroyed or altered. Timing is very important." *Id.* at S6545 (emphasis added). In Senator Lott's view, his amendment would fill this gap: "So this section would allow the Government to charge obstruction *against individuals who acted alone*, even if the tampering took place prior to the issuance of a grand jury subpoena. I think this is something we need to make clear so we do not have a repeat of what we saw with the Enron matter earlier this year." *Id.* (emphasis added) Then-Senator Joseph Biden referred to new subsection (c) as "making it a crime for document shredding," something he thought the pending bill already did. *Id.* at S6546.

Senator Hatch made similar statements regarding the focus of the proposed new subsection on documents and document-shredding, as well as its ties to the then-recent Enron scandal. Senator Hatch explained that "the amendment strengthens an existing federal offense that is often used to prosecute document shredding and other forms of obstruction of justice," noting that current law "does not prohibit an act of destruction committed by a defendant acting alone. While other existing obstruction of justice statutes cover acts of destruction that are committed by an[] individual acting alone, such statutes have been interpreted as applying only where a proceeding is pending, and a subpoena has been issued for the evidence destroyed." *Id.* at S6550. To Senator Hatch, the addition of § 1512(c) "closes this loophole by broadening the scope of Section 1512." *Id.* It "*would permit the government to prosecute an individual who acts alone in destroying evidence, even where the evidence is destroyed prior to the issuance of a grand jury subpoena*." *Id.* (emphasis added). He concluded by noting that the Arthur Andersen prosecutors "had to prove that a person in the corporation corruptly persuaded *another* to destroy or alter documents, and acted with the intent to obstruct an investigation." *Id.* (emphasis added). The new § 1512(c) would ensure "that individuals acting alone would be liable for such criminal acts." *Id.*

27
EXHIBIT 1

To the extent it is relevant at all, the weight of this legislative history is inconsistent with the government's position here. It suggests that, in the wake of the Enron scandal, Congress was faced with a very specific loophole: that then-existing criminal statutes made it illegal to cause or induce *another* person to destroy documents, but did not make it illegal to do so by oneself. Congress closed that loop by passing subsection (c), and nothing in the legislative history suggests a broader purpose than that.

### E. Miller's alleged conduct falls outside of § 1512(c)(2)

For all the foregoing reasons, the Court believes there are two plausible interpretations of the statute: either § 1512(c)(1) merely includes examples of conduct that violates § 1512(c)(2), or § 1512(c)(1) limits the scope of § 1512(c)(2). The text, structure, and development of the statute over time suggest that the second reading is the better one. But the first is, at a minimum, plausible.

At the very least, the Court is left with a serious ambiguity in a criminal statute. As noted above, courts have "traditionally exercised restraint in assessing the reach of a federal criminal statute," *Aguilar*, 515 U.S. at 600, and have "construe[d] penal laws strictly and resolve[d] ambiguities in favor of the defendant," *Nasir*, 17 F.4th at 473 (Bibas, J., concurring) (citing *Liparota*, 471 U.S. at 427). Applying these principles here "gives citizens fair warning of what conduct is illegal, ensuring that [an] ambiguous statute[ ] do[es] not reach beyond [its] clear scope." *Nasir*, 17 F.4th at 473 (Bibas, J., concurring). And it makes sure that "the power of punishment is vested in the legislative, not the judicial department." *Id.* (quoting *United States v. Wiltberger*, 18 U.S. (5 Wheat.) 76, 95 (1820) (Marshall, C.J.)). The Court therefore concludes that § 1512(c)(2) must be interpreted as limited by subsection (c)(1), and thus requires that the defendant have taken some action with respect to a document, record, or other object in order to corruptly obstruct, impede or influence an official proceeding.

EXHIBIT 1

Miller, however, is not alleged to have taken such action.  Instead, Count Three of the Second Superseding Indictment alleges only that he "attempted to, and did, corruptly obstruct, influence, and impede an official proceeding, that is, a proceeding before Congress, specifically, Congress's certification of the Electoral College vote as set out in the Twelfth Amendment of the Constitution of the United States and 3 U.S.C. §§ 15–18." Indictment at 2–3. Nothing in Count Three (or the Indictment more generally) alleges, let alone implies, that Miller took some action with respect to a document, record, or other object in order to corruptly obstruct, impede or influence Congress's certification of the electoral vote.

The government nevertheless argues that Miller's conduct "'otherwise obstruct[ed], influence[d], or impede[d]' Congress's ability to review documents that it was constitutionally and statutorily required to receive and act upon, thereby obstructing the certification of the Electoral College vote." *Montgomery* Br. at 40–41 (modifications in original). But none of those facts are set forth in the indictment, and the Court cannot consider them on this Motion to Dismiss. *Akinyoyenu*, 199 F. Supp. 3d at 109–10. And in any event, the government does not argue that Miller *himself* took or attempted to take any action with respect to those records or documents. Absent such an allegation, the Indictment fails to allege a violation of 18 § U.S.C. 1512(c)(2).

\*          \*          \*

For the foregoing reasons, the Court will grant Miller's Motion to Dismiss Count Three of the Superseding Indictment, ECF No. 34.  An appropriate order will follow.

DATE:  March 7, 2022

CARL J. NICHOLS
United States District Judge

EXHIBIT 1