**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Case No. 21-cr-106-TJK** |
| **JEROD WADE HUGHES,** | |
| **Defendant.** | |

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Jerod Wade Hughes to 51 months' incarceration (the middle of the applicable U.S. Sentencing Guidelines range), three years of supervised release, $2,000 in restitution, and the mandatory $100 special assessment.

## I.    INTRODUCTION

The defendant, Jerod Hughes, along with his brother and co-defendant Joshua Hughes, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred law enforcement officers, and resulted in more than 2.8 million dollars in losses.[1]

Jerod Hughes advanced on the Capitol through a violent crowd on the West front, and

---

[1] Although the Statement of Offense in this matter, filed on August 25, 2022, reflects a sum of more than $1.4 million for repairs (ECF 77 at ¶ 6), as of October 17, 2022, the approximate losses suffered as a result of the siege at the United States Capitol was $2,881,360.20. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police.

climbed the scaffolding on the Northwest steps to pass the crowd and advance even further. He pressed up the stairs to the front of the line of rioters working to break the very last police line keeping rioters away from the Capitol. As he arrived at the Senate Wing Door, he watched rioters break the windows to make the first access to the building. He eagerly jumped through the broken window to be the eighth rioter to occupy the U.S. Capitol that day. Once inside, he forcefully kicked open the Senate Wing Door to allow hundreds of rioters to stream inside. Then he roamed the halls and menaced the overpowered police, chasing a lone Capitol Police officer. He screamed angry threats to the police line guarding the Senate chamber, telling them, "There's a fucking army behind us!" and "We are fucking mad!" He pressed even further, occupying the Senate chamber itself and reviewing sensitive documents that had been left behind by Senators forced to flee for their lives.

The government recommends that the Court sentence Jerod Hughes to 51 months' incarceration, which is the middle of the advisory Guidelines' range of 46-57 months.[2] A 51-month sentence reflects the gravity of Jerod Hughes's conduct, but also acknowledges his early admission of guilt.

II.     FACTUAL BACKGROUND

A.     The January 6, 2021 Attack on the Capitol

On January 6, 2021, hundreds of rioters, the Hughes brothers among them, unlawfully broke into the U.S. Capitol Building in an effort to disrupt the peaceful transfer of power after the

---

[2]  Although the government's plea agreement letter states that Jerod Hughes has six criminal history points and so is in Criminal History Category III, upon further review the government has concluded that the U.S. Probation Office correctly calculated that he has only two criminal history points and so is in Criminal History Category II. PSR ¶ 59. Accordingly, the government agrees that the U.S. Probation Office correctly determined that the sentencing guideline range is 46 to 57 months' incarceration. PSR ¶ 94.

November 3, 2020 presidential election. Many rioters attacked and injured law enforcement officers, sometimes with dangerous weapons; they terrified congressional staff and others on scene that day, many of whom fled for their safety; and they ransacked this historic building— vandalizing, damaging, and stealing artwork, furniture, and other property. Although the facts and circumstances surrounding the actions of each rioter who breached the U.S. Capitol and its grounds differ, each rioter's actions were illegal and contributed, directly or indirectly, to the violence and destruction that day. *See United States v. Matthew Mazzocco*, 1:21-cr-00054 (TSC), Tr. 10/4/2021 at 25 ("A mob isn't a mob without the numbers. The people who were committing those violent acts did so because they had the safety of numbers.") (statement of Judge Chutkan).

As set forth in the PSR and the Statement of Offense incorporated into the plea agreement, a joint session of Congress had convened at approximately 1:00 p.m. at the U.S. Capitol. Members of the House of Representatives and the Senate were meeting in separate chambers to certify the vote count of the Electoral College of the November 3, 2020 Presidential election. By approximately 1:30 p.m., the House and Senate adjourned to separate chambers to resolve a particular objection. Vice President Mike Pence was present and presiding, first in the joint session, and then in the Senate chamber.

As the proceedings continued, a large crowd gathered outside the U.S. Capitol. Temporary and permanent barricades were in place around the exterior of the building, and U.S. Capitol Police were present and attempting to keep the crowd away from the building and the proceedings underway inside. At approximately 2:00 p.m., certain individuals forced their way over the barricades and past the officers, and the crowd advanced to the exterior of the building. Members of the crowd did not submit to standard security screenings or weapons checks by security officials.

The vote certification proceedings were still underway, and the exterior doors and windows

of the U.S. Capitol were locked or otherwise secured. Members of the U.S. Capitol Police attempted to keep the crowd from entering; however, starting at approximately 2:13 p.m., individuals in the crowd forced their way in, breaking windows and assaulting law enforcement officers along the way, while others in the crowd cheered them on.

At approximately 2:20 p.m., members of the House of Representatives and the Senate, including the President of the Senate, Vice President Pence, were forced to evacuate the chambers. All proceedings, including the joint session, were effectively suspended. The proceedings resumed at approximately 8:00 p.m. after the building had been secured. Vice President Pence remained in the United States Capitol from the time he was evacuated from the Senate Chamber until the session resumed. *See* Statement of Offense ¶¶ 1-7; PSR ¶¶ 18-24.

### Injuries and Property Damage Caused by the January 6, 2021 Attack

The D.C. Circuit has observed that "the violent breach of the Capitol on January 6 was a grave danger to our democracy." *United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir. 2021). Members of this Court have similarly described it as "a singular and chilling event in U.S. history, raising legitimate concern about the security—not only of the Capitol building—but of our democracy itself." *United States v. Cua*, No. 21-cr-107, 2021 WL 918255, at *3 (D.D.C. Mar. 10, 2021) (Judge Moss); *see also United States v. Foy*, No. 21-cr-108 (D.D.C. June 30, 2021) (Doc. 41, Hrg. Tr. at 14) ("This is not rhetorical flourish. This reflects the concern of my colleagues and myself for what we view as an incredibly dangerous and disturbing attack on a free electoral system.") (Judge Chutkan); *United States v. Chrestman*, 535 F. Supp. 3d 14, 25 (D.D.C. 2021) ("The actions of this violent mob, particularly those members who breached police lines and gained entry to the Capitol, are reprehensible as offenses against morality, civic virtue, and the rule of law.") (Chief Judge Howell); *United States v. Matthew Mazzocco*, 1:21-cr-00054 (TSC),

Tr. 10/4/2021 at 25 ("A mob isn't a mob without the numbers. The people who were committing those violent acts did so because they had the safety of numbers.") (Judge Chutkan).

In addition, the rioters injured more than a hundred members of law enforcement. *See* Staff of Senate Committees on Homeland Security and Governmental Affairs and on Rules and Administration Report, Examining the Capitol Attack: A Review of the Security, Planning, and Response Failures on January 6 (June 7, 2021), at 29, *available at* https://www.hsgac.senate.gov/imo/media/doc/HSGAC&RulesFullReport_ExaminingU.S.Capitol Attack.pdf (describing officer injuries). Some of the rioters wore tactical gear and used dangerous weapons and chemical irritants during hours-long hand-to-hand combat with law enforcement officers. *See id*. at 27-30.

Moreover, the rioters inflicted significant emotional injuries on law enforcement officers and others on scene that day who feared for their safety. *See id*; *see also* Architect of the Capitol, J. Brett Blanton, Statement before the House of Representatives Committee on House Administration (May 19, 2021), *available at* https://www.aoc.gov/sites/default/files/2021-05/AOC_Testimony_CHA_Hearing-2021-05-19.pdf (describing the stress suffered by Architect of the Capitol employees due to the January 6, 2021, attack).

Finally, the rioters stole, vandalized, and destroyed property inside and outside the U.S. Capitol Building. They caused extensive, and in some instances, incalculable, losses. This included wrecked platforms, broken glass and doors, graffiti, damaged and stolen sound systems and photography equipment, broken furniture, damaged artwork, including statues and murals, historic lanterns ripped from the ground, and paint tracked over historic stone balustrades and Capitol Building hallways. *See id*; *see also* United States House of Representatives Curator Farar Elliott, Statement Before the House Appropriations Subcommittee on the Legislative Branch (Feb. 24,

2021), *available at* https://docs.house.gov/meetings/AP/AP24/20210224/111233/HHRG-117-AP24-Wstate-ElliottF-20210224.pdf (describing damage to marble and granite statues). The attack resulted in substantial damage to the U.S. Capitol, resulting in losses of more than 2.8 million dollars.

**B.      Defendant's Role in the January 6, 2021 Attack on the Capitol**

*Hughes Brothers' Travel to the Capitol*

The Hughes brothers traveled together from Helena, Montana, to Washington, D.C. According to testimony Joshua Hughes gave during his February 1, 2021, detention hearing in the District of Montana, *see* Joshua Hughes' Motion to Amend Order of Detention and for Pretrial Release, Attachment A, Dkt. No. 31-1 (hereinafter, "Joshua Hughes Transcript"), they drove through the night on January 3, all day on January 4, and spent the night in Wisconsin. *Id.* at 24. On the morning of January 5, they drove all day to Gaithersburg, Maryland, where they spent a second night. *Id.* According to a screenshot later recovered from Joshua Hughes's cell phone, he received a message from his girlfriend, on January 5, 2021, warning him that the rally he was going to was "potentially extremely violent." Jerod exchanged texts with his friends as well, and told one of them, on the evening of January 5, 2021, "Stay tuned tomorrow buddy Trump is gonna drop the hammer or we are."

The brothers arrived in Washington, D.C., on the morning of January 6, just in time to see then-President Trump speak at the Stop the Steal rally. Joshua Hughes Transcript at 24. After the rally, they had lunch, then made their way to the U.S. Capitol, where they saw "tens of thousands" of people. *Id.* at 27. Joshua Hughes acknowledged that there was "tear gas in the air and people getting OC sprayed." *Id.* Jerod Hughes and Joshua Hughes scaled the scaffolding to charge ahead of the crowd and get closer to the embattled police line. *See* Exhibit 1 ("Insurgence USA" video),

at 34:24 (excerpted below). As they climbed around inside the structure, rioters—some using chemical spray—were fighting to disarm the police and break through the line. Rioters in the crowd encouraged the mob to "push" to break the police line. Eventually, they succeeded.



*Exh. 1: Joshua Hughes (in yellow circle) and Jerod Hughes (in green circle) climb over the heads of other rioters to reach the police line mid-way up the Northwest Stairs*



*Joshua Hughes (in yellow circle) seen with helmet attached to his backpack (with red arrow)*

As he climbed through the scaffolding, Joshua Hughes can be seen in video footage

carrying a helmet attached to his backpack. This indicates a measure of advance planning for violence and chaos. In his February 2021 testimony, on the other hand, Joshua Hughes claimed that he and his brother came to Washington, D.C. just to support President Trump at his rally and then "to go sightseeing." *Id.* at 25.

After the mob broke through this line halfway up the Northwest steps, the crowd surged up the final flight of stairs leading to the Upper West Terrace. One last line of police blocked the rioters' access to the doors of the U.S. Capitol. Joshua Hughes surged ahead even of the rest of the crowd, finding himself at the front of the mob facing off against these officers. *See* Exh. 1 at 39:45 (excerpted below).



Joshua Hughes was at the very front of the mob that forced the bike rack barriers down and breached the police line. He was among the very first rioters to reach the Upper West Terrace. *See id* (excerpted below); *see also* Exhibit 2 ("RMG News" video), at 49:15 (excerpted below).





Once Joshua Hughes made it across the police line and had secured his place on the Upper West Terrace, video footage appears to show him pause and wait for his brother Jerod Hughes. *See* Exhibit 3 ("BGOnTheScene" video) at 10:54 (excerpted below); *see also* Exh. 2, at 50:01 (excerpted below). They met up again just a moment or two later. Joshua Hughes's helmet can again be clearly seen in the video footage. *See* Exh. 3, at 10:54.







Joshua Hughes and Jerod Hughes headed straight for the Senate Wing Door, where they watched rioters smash the windows with their fists and with tools including a stolen police shield and an appropriated two-by-four. Joshua Hughes testified that seeing others climbing through the window, and doing so himself, sent him signals "that maybe this is a place that I shouldn't be in[.]" *Id.* at 40-41. The brothers decided to go inside anyway. *Id.* at 41. As the screenshot below illustrates, they reached for the windowpanes simultaneously, and began hoisting themselves in. Jerod Hughes was the eighth rioter to enter the building, and Joshua Hughes was right on his heels as the ninth. *See* Exh. 3, at 12:25. USCP surveillance footage, excerpted below, shows the brothers in the group of the first ten rioters to storm the building. *See* Exhibit 4 (USCP CCTV at Senate Wing Door interior), at 03:18.





Once inside the Capitol, Jerod Hughes, both on his own and with another rioter, kicked the Senate Wing Door from the inside, and kicked it hard. *See* Exh. 4, at 03:23 (excerpted below). The first time he kicked it, the door bent, but remained locked from the top.



Then Jerod Hughes kicked it again, harder, causing it to bend again, but it did not break apart from the locking mechanism on top. *Id.* at 03:25 (excerpted below).



The third time, another rioter joined him and they kicked together, simultaneously. This time, the door sprang open. As soon as the door was opened, rioters began streaming in. *Id.* at 03:30

(excerpted below). Joshua Hughes saw Jerod Hughes kick the door, and he walked over toward his brother. The door opened before Joshua Hughes reached it. *Id.*



Once inside the Capitol, Joshua and Jerod Hughes headed north toward the Senate. They marched through the halls and found a staircase that led directly to the Senate chamber, one story up. One lone U.S. Capitol Police officer had responded to that area, and the brothers came face-to-face with Officer Eugene Goodman. *See* Exhibit 5 ("ProPublica" video), at 0:51 (excerpted below). They looked back, apparently to ensure they had the mob behind them, before engaging with Officer Goodman further. *Id.*



*Exh. 5: Joshua Hughes (in yellow circle) and Jerod Hughes (in green circle) encounter Officer Goodman (with red arrow) at the foot of the East Grand Staircase leading to the Senate*

Officer Goodman, alone and woefully outnumbered by this mob that included Joshua and Jerod Hughes, ordered the crowd to back up. No one retreated. Instead, the mob—including Joshua and Jerod Hughes—advanced. Jerod was out front, aggressively pointing at Officer Goodman and shouting, "they can't stop us!" *See* Exh. 5, at 1:05 (excerpted below). The rioters surrounding them were aggressive, and some were armed. One of the most visible rioters carried a Confederate flag, which he used to jab at Officer Goodman. As rioters filled in behind that man, they all ignored Officer Goodman's order to leave and back up. They reminded him just how alone he was there, saying, "what are you going to do, you're by yourself." *United States v. Jensen*, 21-cr-6-TJK, Transcript of Trial, Sept. 21, 2022 (testimony of Officer Goodman), attached as Exhibit A, at 204 (hereinafter, "Goodman Transcript") (page numbers refer to transcript pages). He placed his hand on his weapon, a significant gesture that was meant to indicate to the crowd that they needed to heed his warnings. *Id*. at 208. Even this did not stop the crowd from advancing. *Id*.



Officer Goodman repeatedly ordered the rioters to back up and leave the Capitol building. The Hughes brothers and the other rioters refused those commands. Rather, the rioters kept advancing toward Officer Goodman in a menacing manner – even as Officer Goodman had his hand on his service weapon, and even after he retreated to recover a baton that had been dropped onto the floor. *Id.* at 211-212. Officer Goodman "felt like they were going to rush at any time." He was forced to retreat, because, as Officer Goodman recalled, if he had not backed up the stairs at that time, the mob "would have just engulfed me and did whatever they chose. They would have just had their way." *Id.* Video taken by a reporter in the hallway behind Officer Goodman shows Joshua Hughes and Jerod Hughes following close behind the first rioter, Douglas Jensen, pursuing Officer Goodman up the stairs. *See* Exhibit 6 ("Bobric" video) (excerpted below).





As Officer Goodman, who was facing the rioters on his own, retreated up the stairs, he radioed for backup to direct other officers to the mob's location. Jensen, followed by Jerod Hughes, Joshua Hughes, and a mob of angry men, chased Officer Goodman up the stairs. When Officer Goodman reached the second floor, he positioned himself so that he was between the rioters and the Senate floor – which had not yet been evacuated.

Officer Goodman's pursuers found themselves in the Ohio Clock Corridor, just on the other

side of the wall, and one door away from the floor of the U.S. Senate, where the Vice President had been presiding just moments before. Vice President Pence was only evacuated from the area at 2:16 p.m. Senators remained on the floor waiting for a safe time to evacuate, perilously close to the angry mob that included Joshua and Jerod Hughes. And the Hughes brothers made it known that they were angry. When they faced Officer Goodman's reinforcements, they appeared unphased by the growing number of police officers.

Joshua and Jerod Hughes were at the front of the group advancing on the police line. They linked arms as they advanced. Jerod Hughes was exceptionally angry, screaming, "we are fucking mad!" and stomping his foot. Still linking their arms together, they moved forward. Joshua Hughes stood beside his brother and advanced with him. *See* Exhibit 7 ("New York Times" video) (excerpted below).



As they advanced, Jerod Hughes can be heard screaming, "There's a fucking army behind us! You guys don't want this! You don't fucking want this! And we are fucking mad! We are mad! This is my fucking house! This is my country!" Jerod Hughes advanced toward the officers as he

screamed at them, clearly indicating his hostility. Joshua Hughes was, still, right next to his brother, advancing alongside him. *See* Exh. 2, at 53:30 (excerpted below).



Several additional U.S. Capitol Police officers joined Officer Goodman in that hallway and attempted to quell the mob. Officers reported that they were too far outnumbered to attempt to arrest the rioters, so instead they used their training to try to de-escalate the situation by talking with individuals in an attempt to calm them down. These efforts were met with shouting and aggression. As tensions remained high, rioters can be heard shouting "this is our house," "this is our America," and "we're here for the corrupt government."

The Hughes brothers left the Ohio Clock Corridor at around 2:17 p.m. (shown below).



Joshua Hughes's and Jerod Hughes's location inside the Capitol after 2:17 p.m. is unknown until approximately 2:44 p.m. It is clear, however, that they remained in the building for some time. According to Jerod Hughes's text records obtained from his cell phone, he stopped to text one of his friends, at 2:25 p.m., "We broke into the capital." By 2:44 p.m., they can be seen entering the Senate gallery, on the third floor. Video footage shows that they stayed in the Senate gallery for approximately one minute.

Minutes later, at approximately 2:48 p.m., Joshua and Jerod Hughes found their way onto the Senate floor on the second floor of the building. By that time, the Senators had been evacuated and the chamber had been breached by rioters. They entered the Senate chamber through the east doors, which had been opened from the inside by another rioter. Just as they were at the front of the crowd when the building was first breached half an hour earlier, Joshua and Jerod Hughes were once again among the first ten rioters to enter the Senate chamber.

While on the Senate floor, Joshua Hughes (circled in yellow in the images below) and Jerod Hughes (circled in green in the images below) watched along as other rioters reviewed sensitive

material stored on Senators' desks. Jerod Hughes reviewed some of these materials himself.







They walked among the Senators' desks for approximately two minutes, and exited the Senate chamber at approximately 2:51 p.m. They then exited the U.S. Capitol building through the Senate Carriage Door on the east side of the U.S. Capitol building at approximately 2:51 p.m.

According to Joshua Hughes's testimony, after they left, the brothers heard the police announcing a 6:00 p.m. curfew. Joshua Hughes Transcript, at 51. They made their way across town to their car soon afterwards, and began the drive back to Montana. *Id.*

Jerod Hughes's text messages after leaving the building reveal that he was proud of what they had done, and the notoriety he and his brother were receiving.  At 3:16 p.m., he texted a friend, "We just stormed the fuckong [sic] building." Another friend said he couldn't find them on TV, and Jerod Hughes responded, "Just wait we stormed the building." At 4:30 p.m., he followed up with the same friend to announce, "Me and my brother are on newsmax tv walking around the Senate floor[.]" In a particularly revealing message sent at at 7:18 p.m. Jerod Hughes texted, "Not enough people followed us in to hold the place. We had to get the fuck out." In other words, Jerod Hughes intended to "hold" the U.S. Capitol building, and would have continued to occupy the United States Senate if he had the manpower to make it happen.

In his text messages on the evening of January 6, 2021, he also made light of what he had done, minimizing his conduct and suggesting that he had behaved well.  At 6:52 p.m., he texted a family member, "Ah we didnt do anything crazy like destroy shit or fight the cops. Trespass and vandalism. Meh. I've done time. Its josh I worry about." When the family member asked if authorities had photos of Jerod Hughes, he replied, "They got my ugly mug up and down. Trespassing ain't shit. I feel like I was behaving like a model citizen ready to reclaim my country. Not enuff people followed."

<u>Joshua and Jerod Hughes's Self-Report to Helena Police Department</u>

By January 11, 2021, Joshua and Jerod Hughes understood that they were facing possible criminal charges, and they knew from news reports that the FBI was trying to identify them. That day, they went to the Helena Police Department ("PD") to turn themselves in. They declined to speak to the FBI about the events of January 6, 2021, but they did identify themselves in photos from the U.S. Capitol. Since there was no arrest warrant for them, they left the police station that morning.

Several days later, Jerod Hughes texted a friend that he was still waiting for news about any forthcoming case. "Hey sorry buddy we lawyered up and havent heard shit back." His friend opined they might just receive a summons, rather than being arrested. Jerod Hughes texted back, "Yeah that's better than getting hauled off to jail like alot if these people bragging about going in there. I'm hoping I just get a fine when the time comes."

<u>Joshua and Jerod Hughes's Cell Phones</u>

About a week after he reported to the Helena PD on January 11, 2021, Joshua Hughes destroyed the cell phone he had taken with him to the U.S. Capitol by throwing it in the garbage. Joshua Hughes Transcript, at 43-44.

On January 29, 2021, Joshua Hughes and Jerod Hughes reported to the Helena PD and voluntarily provided their cell phones to the FBI, with consent to search the phones. The phone Joshua Hughes provided was a Cricket phone running Android Version 10. He told the FBI that it was not the phone he had taken to the U.S. Capitol on January 6, claiming that phone had gone bad and that he threw it away. Investigators recovered a few text messages, all dated on or after January 16, 2021, in which Joshua Hughes discussed the aftermath of this investigation with his girlfriend. She indicated she was unhappy with his actions on that day. On January 29, 2021, she suggested she should do an interview and "[t]ell them how I tried to stop you and warn you for

weeks up until the insurrection." Investigators also recovered the chat referenced above, in which his girlfriend warned Joshua Hughes that the rally he was about to attend was anticipated "to be potentially extremely violent."

Jerod Hughes provided the FBI a Samsung model cell phone. He reported that the phone he provided was the same device he had with him at the Capitol. When the FBI searched the phone, they recovered the text messages described above.

## III.    THE CHARGES AND PLEA AGREEMENT

The Hughes brothers were charged together in a single complaint on January 28, 2021. The FBI contacted both brothers to make arrangements for them to self-report to federal custody in the District of Montana on February 1, 2021. They were arraigned that day and held pending transfer to the District of Columbia.

On February 10, 2021, a federal grand jury returned an indictment charging both defendants with Civil Disorder in violation of 18 U.S.C. § 231(a)(3), Obstruction of an Official Proceeding in violation of 18 U.S.C. § 1512(c)(2), Destruction of Government Property in violation of 18 U.S.C. § 1361, Entering or Remaining in any Restricted Building or Grounds in violation of 18 U.S.C. §§ 1752(a)(1), Disorderly and Disruptive Conduct in a Restricted Building or Grounds in violation of 18 U.S.C. § 1752(a)(2), Entering and Remaining on the Floor of a House of Congress in violation of 40 U.S.C. § 5104(e)(2)(A), Entering and Remaining in Certain Rooms in the Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(C), Disorderly Conduct in a Capitol Building in violation of 40 U.S.C. § 5104(e)(2)(D), and Parading Demonstrating, or Picketing in a Capitol Building in violation of 40 U.S.C. § 5104(e)(2)(G). The indictment was superseded on November 10, 2021, and again on December 1, 2021, but the charges remain the same.

On August 25, 2022, Jerod Hughes pled guilty to Count Two of the Second Superseding

Indictment, charging Obstruction of an Official Proceeding in violation of 18 U.S.C. § 1512(c)(2), in a combined hearing at which his brother Joshua Hughes also pled guilty to the same charge.

## IV.    STATUTORY PENALTIES

Jerod Hughes now faces sentencing on Obstruction of an Official Proceeding in violation of 18 U.S.C. § 1512(c)(2). As noted by the plea agreement and the U.S. Probation Office, he faces up to 20 years of imprisonment, a fine up to $250,000, and a term of supervised release of not more than three years for Count Two, Obstruction of an Official Proceeding.

## V.    THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007). "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark" for determining a defendant's sentence. *Id.* at 49. The United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions" and are the "starting point and the initial benchmark" for sentencing. *Id.* at 49.

The government agrees with the offense guideline calculation set forth in the PSR, which is consistent with the agreed-upon estimated offense level set forth in the plea agreement. *See* PSR ¶¶ 41-52; Plea Agreement p. 3, ¶ 5(A), (B). The Guidelines are calculated as follows:

<u>Count Two: 18 U.S.C. § 1512(c)(2)</u>

| | | |
|---|---|---|
| U.S.S.G. §2J1.2(a) | Base Offense Level | 14 |
| U.S.S.G. §2J1.2(b)(1)(B) | Threat or Physical Injury to Person or Property | +8 |
| U.S.S.G. §2J1.2(b)(2) | Resulted in Substantial Interference[3] | +3 |
| | **Total** | **25** |
| Acceptance of responsibility (U.S.S.G. §3E1.1) | | -3 |
| **Total Adjusted Offense Level:** | | **22**[4] |

*See* Plea Agreement at ¶ 5(A), (B).

The U.S. Probation Office determined, as have the parties, that the 8-level adjustment under U.S.S.G. §2J1.2(b)(1)(B) for causing or threatening to cause physical injury to a person, or property damage, in order to obstruct the administration of justice, should apply. In particular, the Probation Office determined that this adjustment is supported by the fact that Jerod Hughes encountered U.S. Capitol Police Officer Eugene Goodman at the staircase leading up to the Senate Chamber, and followed close behind other rioters who chased Officer Goodman up the staircase, despite the officer's repeated pleas to stop and back up. *See* PSR ¶ 43. The government agrees that this conduct supports the 8-level increase. Jerod and Joshua Hughes were right on the heels of

---

[3] The term "substantial interference with the administration of justice" as defined in the commentary, "include[s] . . . the unnecessary expenditure of substantial governmental or court resources." *See* U.S.S.G. § 2J1.2(b)(2), Application Note 1. Jerod Hughes admitted that he corruptly obstructed and impeded an official proceeding, namely the certification of the Electoral College vote count. The riot resulted in evacuations, vote count delays, officer injuries, and more than 2.8 million dollars in losses. As described herein, law enforcement from all over the D.C. metropolitan area responded to assist in protecting the Capitol from the rioters.

[4] As the parties and the Probation Officer all agree, the victim enhancement in U.S.S.G. § 3A1.2(a) does not apply here. Obstruction of Congress has no individual victim; the victim of obstruction in Count Two is Congress, i.e., the government. The government does not qualify as a victim for purposes of the victim enhancement in U.S.S.G. § 3A1.2(a). *See* U.S.S.G. § 3A1.2 cmt. n. 1 (victim enhancement applies "when specified individuals" are victims, but "does not apply when the only victim is an organization, agency, or the government").

Douglas Jensen, the rioter who led the chase of Officer Goodman. As they pursued him up the stairs, the mob shouted angry, hateful, and intimidating threats, including: "Keep running, motherfucker!"; "He's one person, we're thousands!"; and "what are you gonna do, beat us all?" *See* Exh. 5 (ProPublica video). In context, Jerod and Joshua Hughes' participation in this assault on Officer Goodman was particularly threatening.

In addition, the adjustment is warranted because of Jerod Hughes's efforts (which were ultimately successful) to break open the Senate Wing Door. This act made it possible for hundreds of rioters to stream into the building, contributing to the success of the rioters' mission to obstruct the Congressional proceedings and stop the certification of the electoral college votes. According to the Architect of the Capitol, the door was in fact damaged as a result of the forced opening, and the glass and hardware needed to be replaced. The Architect of the Capitol estimated that the repair cost was approximately $7,260. As noted above, the parties are in agreement that this enhancement applies to Jerod Hughes's conduct in this case.

The U.S. Probation Office calculated Jerod Hughes's criminal history as category II, a calculation with which the government now concurs. PSR ¶ 59. Accordingly, based on a total adjusted offense level, after acceptance of responsibility, at 22, Jerod Hughes's Guidelines imprisonment range is 46 to 57 months' imprisonment. PSR ¶ 94.

## VI.     SENTENCING FACTORS UNDER 18 U.S.C. § 3553(A)

In this case, sentencing is guided by 18 U.S.C. § 3553(a). Some of the factors this Court must consider include: the nature and circumstances of the offense, § 3553(a)(1); the history and characteristics of the defendant, *id.*; the need for the sentence to reflect the seriousness of the offense and promote respect for the law, § 3553(a)(2)(A); the need for the sentence to afford adequate deterrence, § 3553(a)(2)(B); and the need to avoid unwarranted sentence disparities

among defendants with similar records who have been found guilty of similar conduct, § 3553(a)(6). In this case, as described below, the Section 3553(a) factors weigh in favor of a significant term of incarceration.

### A.    Nature and Circumstances of the Offense

The attack on the U.S. Capitol on January 6, 2021, is a criminal offense unparalleled in American history. It represented a grave threat to our democratic norms; indeed, it was one of the only times in our history when the building was literally occupied by hostile participants. By its very nature, the attack defies comparison to other events.

While each defendant should be sentenced based on his or her individual conduct, each individual person who entered the Capitol and assaulted law enforcement on January 6 did so under the most extreme of circumstances, to which their conduct directly contributed. As a person entered the Capitol, they would—at a minimum—have crossed through numerous barriers and barricades, heard the throes of a mob, and smelled chemical irritants in the air. Depending on the timing and location of their approach, in addition to their own acts of violence, they likely would have observed other extensive fighting with law enforcement.

While looking at the defendant's individual conduct, we must assess such conduct on a spectrum. This Court, in determining a fair and just sentence on this spectrum, should look to a number of critical factors, to include: (1) whether, when, how the defendant entered the Capitol building; (2) whether the defendant encouraged violence; (3) whether the defendant encouraged any acts of property destruction; (4) the defendant's reaction to acts of violence or destruction; (5) whether during or after the riot, the defendant destroyed evidence; (6) the length of the defendant's time inside of the building, and exactly where the defendant traveled; (7) the defendant's statements in person or on social media; (8) whether the defendant cooperated with,

or ignored, law enforcement; and (9) whether the defendant otherwise exhibited evidence of remorse or contrition. While these factors are not exhaustive nor dispositive, they help to place each individual defendant on a spectrum as to their fair and just punishment.

The nature and circumstances of Jerod Hughes's crimes weigh in favor of the recommended sentence. His actions on and leading up to January 6 show that he was prepared for the possibility of violence. He and his brother drove for several days to reach the rally where they planned to hear then-President Trump speak. His brother's girlfriend had warned that significant violence was predicted for the event. Jerod Hughes himself promised a friend, the night before, that either "Trump is gonna drop the hammer or we are."  And on January 6, as the riot reached a fever pitch, he climbed the scaffolding to soar past the crowd on the Northwest steps and make his way quickly to the very front of the mob. He was the eighth rioter to enter the U.S. Capitol building that day, after watching others bash windows with stolen police equipment, weapons, stray objects, and even their fists.

Immediately after getting inside, Jerod Hughes noticed a rioter attempting to break open the Senate Wing Door. That rioter was unsuccessful, but Jerod walked over and began kicking the door himself. He kicked it hard enough that the door bent under his force. Then he kicked it again, even harder. The third time, as another rioter joined him, Jerod Hughes was successful and the door broke open. This allowed hundreds more violent and angry rioters to stream inside.

Once inside, Jerod Hughes joined a mob to chase a lone Capitol Police officer up a staircase that led directly to the floor of the United States Senate, where Senators were sheltering in place. He stood outside the Senate chamber, in the midst of an angry and vicious mob that refused to relinquish the building, as the U.S. Secret Service desperately worked to evacuate Vice President Mike Pence. He linked arms with his brother and advanced on the police line in the Ohio Clock

Corridor, as the number of rioters swelled and the mob threatened to once again overrun the U.S. Capitol Police. As Joshua Hughes and Jerod Hughes stood arm-in-arm, Jerod Hughes spewed anger at the police, shouting, "We are fucking mad!" and making sure the police knew just how outnumbered they were. The tone was particularly menacing because the crowd had forced through countless lines of USCP officers before this one, each time successfully.

After all this, Jerod Hughes and his brother found their way into the Senate Chamber itself. They looked around as other rioters climbed onto furniture and rifled through paperwork. Jerod Hughes examined the confidential paperwork that had been left out in the chamber when the Senators were forced to flee. He occupied, by force, the heart of American democracy. And his text messages after the fact show that he would have maintained his control over Congress if more rioters had joined to support him. Jerod Hughes intended to obstruct the proceedings that day. His actions on January 6 show an absolute disregard for the rule of law.

### B.  The History and Characteristics of the Defendant

Jerod Hughes is a 37-year-old currently working as a steel worker in Helena, Montana. PSR ¶ 81. He is married and has one child, a 16-year-old daughter. PSR ¶ 67.

As the PSR describes, Jerod Hughes is the primary caregiver for his wife, who is disabled. *Id.* Yet there is no evidence that another family member could not fill that role during his period of incarceration. Indeed, Jerod Hughes left home, and presumably found another caretaker, for nearly a week when he voluntarily drove with his brother to Washington, D.C., and assaulted the Capitol. His contributions to his family may be laudable, but his family's need existed when the defendant made the decision to commit this crime, and yet he persisted. In short, this factor does not mitigate the significant aggravated conduct by the defendant on January 6, 2021.

Jerod Hughes has several criminal convictions, with the most recent occurring in 2015.

PSR ¶ 58. That disorderly conduct conviction resulted from a fight at the Magic Diamond Casino, where Jerod Hughes worked as a food runner. When the police arrived, they interviewed Jerod Hughes, and he admitted that he had first verbally confronted another casino employee, then punched him during a physical altercation. *Id.* He was sentenced to 10 days' incarceration, which was suspended. *Id.*

In 2013, Jerod Hughes was arrested for assault, and he was convicted in January 2014. PSR ¶ 57. The Probation Office did not obtain further information about this misdemeanor assault conviction or the full details of the defendant's sentence. *Id.*

Several years earlier, in 2005, Jerod Hughes had a string of convictions relating to drug distribution. On June 24, 2005, he was stopped at a checkpoint and police officers obtained consent to search the car in which he was traveling. PSR ¶ 54. They found a backpack with several baggies of marijuana, which Jerod Hughes acknowledged belonged to him. *Id.* He pled guilty to possession with intent to distribute and his sentence was deferred for a three-year period. *Id.*

On November 12, 2005, however, Jerod Hughes sold two ounces of cocaine to a confidential informant in a controlled buy. PSR ¶ 55. He was charged with a felony and pled guilty in March 2006. *Id.* He received a sentence of three years' incarceration, but that sentence was also suspended. *Id.* This new criminal case resulted in the revocation of his probation for the June 2005 marijuana conviction. He was sentenced to five years of incarceration on the June 2005 case. PSR ¶ 54. Based on the information gathered by the Probation Office, it appears he spent approximately a year in custody until January 5, 2007, when the remainder of his sentence was reduced to a suspended sentence. *Id.*

In December 2005, during what appears to be the term of custody he served for the two drug distribution offenses referenced above, Jerod Hughes was charged with disorderly conduct.

PSR ¶¶ 56, 54. Based on the timing of this criminal charge, it appears to relate to an episode of violence, described in the PSR, in which he and another inmate engaged in a fight, in which Jerod Hughes attempted to punch the other inmate. The inmate avoided being hit, but punched Jerod Hughes in return. PSR ¶ 54. Jerod Hughes was sentenced to a 6-month custodial sentence that was suspended but for two days. PSR ¶ 56.

Jerod Hughes's criminal history shows a pattern of violent conduct and law breaking that continued through his behavior on January 6, 2021. While his more serious convictions are dated, he has spent time in custody in the past, including for his attempts to resolve disagreements with violence. His actions on January 6 suggest that these tendencies have not abated. His past criminal conduct is another indicator that a significant period of incarceration in this case is warranted.

### C.   The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds, and all that it involved, was an attack on the rule of law. "The violence and destruction of property at the U.S. Capitol on January 6 showed a blatant and appalling disregard for our institutions of government and the orderly administration of the democratic process."[5] As with the nature and circumstances of the offense, this factor supports a sentence of incarceration. Jerod Hughes's criminal conduct, corruptly obstructing of the proceedings in Congress from the floor of the Senate itself after breaching a number of police lines, is the epitome of disrespect for the law. When Jerod Hughes entered the Capitol grounds, and the Capitol itself, it was abundantly clear that lawmakers, and the law enforcement officers who tried to protect them, were under siege. The police were overwhelmed,

---

[5] Federal Bureau of Investigation Director Christopher Wray, Statement before the House Oversight and Reform Committee (June 15, 2021) (hereinafter "FBI Director Wray's Statement"), available at
https://oversight.house.gov/sites/democrats.oversight.house.gov/files/Wray%20Testimony.pdf

outnumbered, and in some cases, in serious danger. The crowd chasing Officer Goodman through the halls and up the stairs—with Jerod Hughes near front and center—reminded the officer just how outnumbered he was. The rule of law was not only disrespected; it was under attack that day. A lesser sentence would suggest to the public, in general, and future rioters, specifically, that attempts to obstruct official proceedings are not taken seriously. In this way, a lesser sentence could encourage further abuses. *See Gall*, 552 U.S. at 54 (it is a "legitimate concern that a lenient sentence for a serious offense threatens to promote disrespect for the law").

### D.     The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

### *General Deterrence*

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C. § 3553(a)(2)(B). The need to deter others is especially strong in cases involving domestic terrorism, which the breach of the Capitol certainly was.[6] The demands of general deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol. The violence at the Capitol on January 6 was cultivated to interfere, and did interfere, with one of the most important democratic processes we have: the transfer of power. As noted by Judge Moss during sentencing, in *United States v. Paul Hodgkins*, 21-cr-188-RDM:

> [D]emocracy requires the cooperation of the governed. When a mob is prepared to attack the Capitol to prevent our elected officials from both parties from performing

---

[6] *See* 18 U.S.C. § 2331(5) (defining "'domestic terrorism'").

> their constitutional and statutory duty, democracy is in trouble. The damage that
> [the defendant] and others caused that day goes way beyond the several-hour delay
> in the certification. It is a damage that will persist in this country for decades.

Tr. at 69–70. Indeed, the attack on the Capitol means "that it will be harder today than it was seven

months ago for the United States and our diplomats to convince other nations to pursue democracy.

It means that it will be harder for all of us to convince our children and our grandchildren that

democracy stands as the immutable foundation of this nation." *Id.* at 70.

The gravity of these offenses demands deterrence. This was not a protest. *See id.* at 46 ("I

don't think that any plausible argument can be made defending what happened in the Capitol on

January 6th as the exercise of First Amendment rights."). And it is important to convey to future

rioters and would-be mob participants—especially those who intend to improperly influence the

democratic process—that their actions will have consequences. There is possibly no greater factor

that this Court must consider.

### *Specific Deterrence*

The need for the sentence to provide specific deterrence to this particular defendant also

weighs in favor of a significant term of incarceration. Jerod Hughes has never acknowledged the

weight and impact of his actions, or of his own role in turning the riot into an all-out assault on

American democracy. To the contrary, even after the fact, knowing he was on camera and likely

to face prosecution, Jerod Hughes told his family member, "Ah we didnt do anything crazy like

destroy shit or fight the cops. Trespass and vandalism. Meh. I've done time." He went so far as to

claim he was "behaving like a model citizen" when he stormed the Capitol and traipsed around the

floor of the United States Senate. He showed so little regard for the serious crimes he had

committed that even two weeks later, he told a friend he should be treated more leniently from

other rioters, adding, "I'm hoping I just get a fine when the time comes." Clearly, Jerod Hughes

did not appreciate the serious damage he and the rest of the mob had done. Public images of Jerod Hughes and his brother, in a group of other rioters carrying protective gear or dressed for battle, on the floor of the U.S. Senate, are haunting. His vicious verbal assaults on the police officers in the Ohio Clock Corridor, including Officer Goodman—caught on video for the world to see—are chilling. This defendant's sentence must be sufficient to provide specific deterrence from committing future crimes of the same nature.

### E.    The Importance of the Guidelines

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United States*, 551 U.S. 338, 349 (2007). As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007); 28 U.S.C. § 994(m). In so doing, the Commission "has the capacity courts lack to 'base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise,'" and "to formulate and constantly refine national sentencing standards." *Kimbrough*, 552 U.S. at 108. Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101. As the Third Circuit has stressed:

> The Sentencing Guidelines are based on the United States Sentencing Commission's in-depth research into prior sentences, presentence investigations, probation and parole office statistics, and other data. U.S.S.G. §1A1.1, intro, comment 3. More importantly, the Guidelines reflect Congress's determination of potential punishments, as set forth in statutes, and Congress's on-going approval of Guidelines sentencing, through oversight of the Guidelines revision process. *See* 28 U.S.C. § 994(p) (providing for Congressional oversight of amendments to the Guidelines). Because the Guidelines reflect the collected wisdom of various institutions, they deserve careful consideration in each case. Because they have been produced at Congress's direction, they cannot be ignored.

*United States v. Goff*, 501 F.3d 250, 257 (3d Cir. 2005). "[W]here judge and Commission *both* determine that the Guidelines sentences is an appropriate sentence for the case at hand, that sentence likely reflects the § 3553(a) factors (including its 'not greater than necessary' requirement)," and that "significantly increases the likelihood that the sentence is a reasonable one." *Rita*, 551 U.S. at 347 (emphasis in original). In other words, "the Commission's recommendation of a sentencing range will 'reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives.'" *Kimbrough*, 552 U.S. at 89.

Here, while the Court must balance all of the § 3553 factors to fashion a just and appropriate sentence, the Guidelines unquestionably provide the most helpful benchmark. The government has charged a considerable number of defendants with crimes based on the January 6 riot. This includes hundreds of felonies and misdemeanors that will be subjected to Guidelines analysis. In order to reflect Congress's will—the same Congress that served as a backdrop to this criminal incursion— the Guidelines will be a powerful driver of consistency and fairness moving forward.

### F.      Unwarranted Sentencing Disparities

Finally, as to 18 U.S.C. § 3553(a)(6)—the need to avoid unwarranted sentencing disparities—the crimes that the defendant and others like him committed on January 6 are unprecedented. These crimes defy statutorily appropriate comparisons to other obstructive conduct in other cases. To try to mechanically compare other Section 1512 defendants prior to January 6, 2021, would be a disservice to the magnitude of what the riot entailed and signified.

In *United States v. Jacob Chansley*, 21-cr-003-RCL, the defendant both participated in the chase of Officer Goodman and made his way to the Senate floor, much like Joshua and Jerod Hughes. Chanlsey, a "Qanon shaman," made himself the face of the January 6 attack. He took the same path as the Hughes brothers to reach the Capitol, and like them, entered the Upper West

Terrace among first 30 rioters. Unlike the Hughes brothers, he did not climb through a broken window; instead, he entered the building by walking through the very door Jerod Hughes broke open. Like the Hughes brothers, Chansley challenged police officers who directed rioters to leave and instead followed others to chase Officer Goodman up to the Ohio Clock Corridor. Chansley used a bullhorn, said former Vice President Pence was a traitor, left a note on the Senate dais, and gave TV interviews. Chansley's sentencing guidelines range was 41-51 months, and the government recommended a sentence of 51 months' imprisonment. Judge Lamberth sentenced Chansley to 41 months' imprisonment for his violation of Section 1512(c)(2).

In *United States v. Greg Rubenacker*, 21-cr-193-BAH, like the Hughes brothers and Chansley, the defendant was also among the mob who chased Officer Goodman to the Ohio Clock Corridor. Like Chansley, he entered through the door that Jerod Hughes kicked open, not through the broken window. He then exited the building, only to breach the Capitol again at a different location. When he returned, he smoked marijuana in the Rotunda, and had to be forced out with pepper spray before he would leave; he even resisted police efforts to clear him from the Rotunda by swinging a water bottle at one officer's head and throwing liquid at other officers who were engaging with a rioter. Like the Hughes brothers, he pled guilty to 18 U.S.C. § 1512(c)(2) and faced a Guidelines range of 41-51 months. The government requested a mid-range sentence. Chief Judge Howell sentenced Rubenacker to 41 months in custody.

In *United States v. Joshua Pruitt*, 21-cr-023 (TJK), another obstruction case where the defendant was charged under 18 U.S.C. §§ 1512(c)(2), this Court imposed sentence following the defendant's guilty plea. Pruitt had begun his initiation into the Proud Boys several weeks prior to January 6, 2021, engaged in extensive preparations for that day, and expressed his readiness for violence, including sending pictures of himself posing with weapons with accompanying text such

as "Ready for the 6th." Pruitt followed a similar path toward the Capitol as the Hughes brothers, and entered through the Senate Wing Door that Jerod Hughes had kicked open. Once inside, Pruitt traveled to various locations, threw a wooden sign and a chair, and engaged in what USCP officers in the area referred to as "pre-assault indicators"—pointing his finger at officers, taunting them, and taking a fighting stance—much like the Hughes brothers and the rest of the mob in the Ohio Clock Corridor. Pruitt did not enter the Senate chamber, but he did encounter Senator Schumer and his security detail attempting to evacuate. He sped towards them, causing the officers in the detail to rush the Senator away from Pruitt. In the days following January 6, Pruitt continued to post threatening messages on social media and gave interviews in which he denied wrongdoing. Pruitt's criminal history resulted in a Guidelines range of 51 to 63 months' imprisonment. The government recommended a sentence at the high end of that range, and this Court imposed a mid-range 55-month sentence.

In four other Capitol Siege cases in which defendants pled guilty to obstruction charges, *United States v. Duke Wilson*, 21-cr-345 (RCL), *United States v. Scott Fairlamb*, 21-cr-12 (RCL), and *United States v. Marshall Neefe and Charles Bradford Smith*, 21-cr-562 (RCL), each defendant faced advisory Guidelines ranges of 41-51 months. Judge Lamberth, who sentenced all four of these defendants in addition to Chansley, imposed incarceration sentences of 41months for all except Wilson, who received 51 months.[7]

This Court should impose sentence of 51 months in this case, a mid-range sentence slightly higher than these similar defendants because it reflects Jerod Hughes's additional criminal history and correspondingly higher Guidelines range. As shown by the foregoing discussion of other

---

[7] Wilson was present in the Lower West Terrace tunnel and used a PCV pipe to attack one of the U.S. Capitol Police officers defending the building there. *United States v. Duke Wilson*, 21-cr-345 (RCL), ECF No. 29, at 11-12.

Section 1512(c)(2) cases, such a sentence would not create an unwarranted disparity. So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United States*, 552 U.S. 38, 54 (2007). In short, "the Sentencing Guidelines are themselves an anti-disparity formula." *United States v. Blagojevich*, 854 F.3d 918, 921 (7th Cir. 2017).

## VII.    RESTITUTION

The Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes."[8] *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011). Generally, restitution under the VWPA must "be tied to the loss caused by the offense of conviction," *Hughey v. United States*, 495 U.S. 411, 418 (1990), identify a specific victim who is "directly and proximately harmed as a result of" the offense of conviction, 18 U.S.C. § 3663(a)(2), and is applied to costs such as the expenses associated with recovering from bodily injury, 18 U.S.C. § 3663(b). At the same time, the VWPA also authorizes a court to impose restitution "in any criminal case to the extent agreed to by the parties in a plea agreement." *See* 18 U.S.C. § 3663(a)(3). *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

Those principles have straightforward application here. The parties agreed, as permitted under 18 U.S.C. § 3663(a)(3), that the defendant must pay $2,000 in restitution to the Architect of

---

[8] The Mandatory Victims Restitution Act, Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), which "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA, *Papagno*, 639 F.3d at 1096, does not apply here. *See* 18 U.S.C. § 3663A(c)(1).

the Capitol, which reflects in part the role he played in the riot on January 6.[9] Plea Agreement at

¶ 12. As the plea agreement reflects, the riot at the United States Capitol had caused

"approximately $1,495,326.55" in damages, a figure based on loss estimates supplied by the

Architect of the Capitol in mid-May 2021. *Id.* Jerod Hughes's restitution payment must be made

to the Clerk of the Court, who will forward the payment to the Architect of the Capitol. *See* PSR

¶ 118.

## VIII.   CONCLUSION

For the reasons set forth above, the government recommends that the Court impose a

sentence of imprisonment of 51 months, which is in the middle of the guideline range as now

calculated by the government and as set forth in the PSR, three years of supervised release,

restitution of $2,000, and the mandatory $100 special assessment.

<div style="margin-left: 40%">

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By:   /s/ *Emily W. Allen*
EMILY W. ALLEN, Cal. Bar No. 234961
Assistant United States Attorney
601 D Street, N.W.
Washington, DC 20530
emily.allen@usdoj.gov
(907) 271-4724

</div>

---

[9] Unlike under the Sentencing Guidelines for which the government does not qualify as a victim, *see* U.S.S.G. § 3A1.2 cmt. n.1, the government or a governmental entity can be a "victim" for purposes of the VWPA. *See United States v. Emor*, 850 F. Supp.2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).